**STATE of Minnesota, Respondent,**

v.

**George GRAHAM, Appellant.**

**No. C4–83–310.**

Supreme Court of Minnesota.

July 19, 1985.

Stephen W. Cooper, Neighborhood Justice Center, St. Paul, C. Paul Jones, Public Defender, Robert D. Goodell, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Tom Foley, Ramsey County Atty., Steven C. DeCoster, Asst. Ramsey County Atty., St. Paul, for respondent.

YETKA, Justice.

Defendant was tried and convicted in Ramsey County District Court of first-degree murder and other crimes. He was sentenced to life imprisonment and now appeals his conviction. We affirm.

George Graham, who had escaped from federal custody 6 months before, spent May 16 with his ex-wife, Carol Anne Hummel, in Fridley. He started drinking early in the day and apparently did not take too many breathers. By 9:00 p.m., when he left, Hummel testified that Graham was "absolutely" drunk. Taking her blue Chevrolet, Graham drove off.

About 15 minutes later, approximately the time it takes to drive from Hummel's residence to the Har-Mar Mall area, Officer Russell came up behind a blue Chevrolet. The Chevrolet took off at a rapid speed through a fast-food restaurant's parking lot and onto Snelling Avenue going south, accelerating to 60–70 miles per hour. Red lights flashing, the chase was on. The Chevrolet driver tried to shake Russell with a 180-degree turn, but Russell kept up the chase. The Chevrolet then made a quick turn onto Roselawn and sped off. While trying to negotiate a turn onto Fairview, however, the Chevrolet skidded into a ditch.

Getting out of his squad car, Officer Russell approached the disabled Chevrolet. A witness testified that she did not observe a weapon in Russell's hand. As the officer approached the car, another witness heard several shots fired. That witness then saw Russell stagger backwards. More shots, two volleys of three, were fired. Russell retreated to his squad car where he told an officer who had just arrived, "He shot me." and slumped into unconsciousness. Retrieving Russell's gun, the officer noted that all six of its shells had been fired.

The gunman had escaped; a manhunt ensued. Several residents told police that they had seen a dirty, bloodied man. He had tried to enter several of their homes to use the telephone. The police, with the help of dogs, followed the escapee's trail, but lost it. At 12:30 a.m., two St. Paul officers who were part of the manhunt were walking through a parking lot a half mile south of the incident when they noticed a car with fogged windows. Looking in, they saw a bloodied figure, ordered him out, searched, and handcuffed him. Seeing that their suspect was wounded, they brought him to St. Paul-Ramsey Hospital. Their suspect was George Graham.

Graham was linked to the crime by a plethora of evidence. For example, when the Chevrolet's license was traced to Hummel, she informed police that Graham had driven off with the car. All witnesses, both of the chase and of the shooting, saw only one person in the Chevrolet. Graham's blood was consistent with blood samples found at the scene. Eyeglasses found broken at the scene, although not identical, were very similar to Graham's prescription with only a one-in-several-thousand chance that they were not his.

The defendant raises these issues on appeal:

1. Did the court err by not removing a juror for cause, forcing the defense to remove the juror with one of its pre-emptory challenges?

2. Did the prosecutor inject undue sympathy and bias by crying during his opening argument and by calling the defendant an "executioner" in his final argument?

3. Did the trial court err in refusing to limit use of the defendant's criminal record for impeachment purposes if the defendant took the stand?

4. Did the trial court err in refusing the defendant's request for a self-defense instruction?

5. Did the trial court err in refusing to show a video tape of dogs hunting the defendant and by showing a video of the defendant in the hospital?

6. Did the trial court err in a number of miscellaneous evidentiary and discovery rulings?

*1. Removal of Juror for Cause*

The defense lists a number of statements by a juror who testified that, when watching the news reports, she assumed that the defendant was the man who killed the officer. She also testified that she really thought she could presume the defendant innocent. The juror must simply undertake to try the case fairly. *See State v. Salas*, 306 N.W.2d 832, 836 (Minn.1981). The judge, being in the best position to observe and judge the demeanor of the prospective juror, should be given deference in determining if a juror should be removed for cause. In this case, Eleanor Petersen said that, in the past, she had assumed the defendant guilty, but now she

believed she could presume the defendant innocent and fairly try the case. The judge believed her, as is in his province to do. Thus, the trial court did not err.

2. *Injection of Undue Sympathy and Bias*

a. *Crying During the Opening Argument*

■ The prosecutor opened the trial with a speech, foreshadowing what he hoped to show the jury with his evidence. In a very matter-of-fact way, he related whom he would call and what they would say until he reached the point of reconstructing the shooting. At that point, the prosecutor said:

> On Fairview approximately three houses up from Roselawn live the Wolvertons, a young family. They have approximately a 13 year old boy, nicknamed Chip Wolverton. He and his mother are up in his bedroom. That bedroom overlooks the street of Fairview, crossed on to Draper. They as well as all the other neighbors will testify, I suspect, that they hear the siren from some ways off. The sirens are approaching their particular area. Some of them will testify to the fact that they will hear the screeching of the turn, the fact of the first car making the turn and going down into the ditch. Mrs. Wolverton, Ann Wolverton, and Chip Wolverton will testify to the fact that they looked out the window based upon what they hear. It is approximately again 9:15 P.M. being May 16. It's at the very end of the twilight hours, just getting to its darkest stage. They look out. They see the car with its headlights shining back up into the road. The squad car is there. The police officer, Officer Russell, the 28 year old police officer having been on the force approximately one year, formerly having done employment as a security guard at International Harvester, down in another midwestern state, a young man who grew up in northern Minnesota area, his parents live there, a married man with a child—

THE COURT: Ladies and Gentlemen, we are going to recess for a few moments here. * * * The record should reflect that the Court is now in Chambers, the Court having taken a short recess at the request of Mr. Tuohy.

The recess was requested because the prosecutor became "choked up." Whether he actually wept is not in the record. Even the defense attorney agreed in chambers that the incident was "legitimate and accidental." If there was any prejudice, the prosecutor did his best to eliminate it by asking for a recess. How much effect this had on the jury is simply impossible to tell from reading the transcript. The trial judge, who was in the best position to judge, did not feel sufficient prejudice inured to warrant a mistrial. No clear abuse of discretion appears on the record. *See Brennan v. United States,* 240 F.2d 253 (8th Cir.1957), *cert. denied,* 353 U.S. 931, 77 S.Ct. 718, 1 L.Ed.2d 723 (1957) (trial court has duty to supervise, direct, and control proceedings and will not be reversed absent a clear abuse of discretion). The trial court was within its discretion in not granting the mistrial.

■ The defense also argues that the subject matter, the victim's personal life, was not a proper subject for the opening statement. While it is true that the quality or personal details of the victim's life are not strictly relevant to the issue of who murdered the victim, it would seem to tie unduly the hands of the prosecutor to prohibit any mention of the victim's life. The victim was not just bones and sinews covered with flesh, but was imbued with the spark of life. The prosecution has some leeway to show that spark and present the victim as a human being as long as it is not an "attempt to invoke any undue sympathy or inflame the jury's passions." *State v. Plan,* 316 N.W.2d 727, 728 (Minn.1982). The prosecutor's speech was not such an attempt.

b. *Calling the Defendant an Executioner During the Closing Argument*

■ The defense objects to the prosecutor's closing argument where he said:

As far as the crime itself, and we're back to the area of the shooting, both persons shot each other. You might recall the comment as we all got together two weeks ago about the defense attorney stating that Bruce Russell, the police officer, passed away. It should be clear from this trial the fact that Bruce Russell did not just pass away. It should be clear from the observations you've made, State's Exhibit 46B the pattern of the gunshots into the body of Bruce Russell, that he didn't just pass away. He was murdered. And as far as the pattern that you see into the body of Bruce Russell, the gunshots fired by this defendant, they're just as pinpoint and just as close to each other as if he had had a stake, an imaginary stake at the back of his back, and he was tied to the stake and executed. That's exactly what this defendant did; he executed Bruce Russell. He did it because he intended to do it. He intended to do it because he had a motive, and that motive was, again, he was an escaped federal prisoner. He had to get himself out of there.

This is the only reference made by the prosecutor to the defendant being an executioner. In contrast, in *Commonwealth v. Gilman*, 470 Pa. 179, 368 A.2d 253 (1977), cited as a "similar case" by the defense, the prosecutor persisted in a long, vehement, shouting tirade where he called the defendant not only an "executioner," but also a " 'cold-blooded killer,' 'sly,' 'calculating,' and 'deceiving.' " The conviction was reversed not just because the prosecutor called the defendant an executioner, but because the prosecutor "continually exceeded the bounds of permissible argument." It was an egregious situation; this case is not. Thus, the trial court was well within its discretion not to order a new trial for prosecutorial misconduct during the closing argument.

### 3. *Limiting Use of Criminal Record for Impeachment*

Near the close of the state's case, the defense moved that the defendant's prior criminal record not be used against him on cross-examination should he take the stand in his own defense. The court denied the motion, stating "that in the event the defendant does take the stand, that he has put in issue his life history and the State may inquire as to his background events." Although the judge's statement was overbroad as a statement of general law, in the context, it should not be taken literally, but simply as the judge's ruling that Graham's heinous criminal record was admissible.

The reason the defense wanted to keep Graham's criminal record out is obvious: it is extensive. In 1968, he was convicted of manslaughter. In 1975, he was convicted of armed robbery of a bank, armed robbery of a grocery store, aggravated robbery of a grocery store, and aggravated assault for running down a police officer with his car.

Admission of convictions for impeachment purposes is governed by the Minnesota Rules of Evidence:

**(a) General rule.** For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if * * * established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year * * * and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect * * *.

**(b) Time limit.** Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction * * *.

Minn.R.Evid. 609. Not having been released yet for the 1975 convictions, it having been approximately 8 years since his release for the 1968 conviction, none of Graham's prior convictions had decayed under the rule.

Whether the probative value of the convictions outweighs their prejudicial effect is a matter left to the discretion of the trial court. *State v. Amos*, 347 N.W.2d 498, 502 (Minn.1984). *See also State v.*

*Bettin,* 295 N.W.2d 542 (Minn.1980). The trial court's decision will not be overturned absent a clear abuse of discretion. *Amos,* 347 N.W.2d at 502. The defendant's arguments for exclusion rest largely on his right to testify rather than on any abuse of discretion by the trial court. The court's ruling did not directly prevent Graham from testifying. He could have done so, but had he taken the stand and thereby put his credibility at issue, his past crimes, determined relevant to his credibility under the Rules of Evidence, could be used to impeach him. No abuse having been shown, the judge's ruling stands.

### 4. *Self-Defense Instruction*

While there is no burden on a defendant to prove self-defense, the defendant does have the "burden of going forward with evidence to support his claim of self-defense." *State v. Columbus,* 258 N.W.2d 122, 123 (Minn.1977). If the defendant does not go forward with such evidence, there is no right to the self-defense instruction. The process of going forward with evidence is complete when the defendant submits "reasonable evidence that the victim was committing an independent assault on defendant at the time defendant fired the gun." *State v. Johnson,* 310 N.W.2d 96, 97 (Minn.1981).

In this case, there is evidence that Officer Russell did not commit an assault. One witness saw a human figure standing behind the open door of the Chevrolet, then heard several shots in rapid succession, saw the officer stumble backwards, and then heard two volleys of three shots each. Graham's gun was found with four empty shells; Officer Russell's with six. The defense's argument for the instruction is that, since the evidence was circumstantial, there is no way of telling who fired first; therefore, it could have been Russell as well as it could have been Graham. The argument is not supported with any evidence and is not even a rebuttal to the state's evidence that Graham was the aggressor. Thus, the defense failed in its burden to go forward with evidence of an independent assault by Officer Russell, and the trial court's refusal to give the instruction was proper.

### 5. *Video Tapes*

#### a. *Dog Tapes*

The St. Paul police video-taped a re-enactment of dogs tracking the defendant after the murder. The tape was not introduced into evidence, but was shown to the jury. While deliberating, the jury wanted to see the tape. Although at first seeming to allow the showing, the trial judge eventually decided not to reshow the tape because it was "misleading." The real problem with the tape, however, was that it was not in evidence. It was shown, we assume, for illustrative purposes. Not being in evidence, the jury cannot use it in its deliberations. Thus, the trial court was correct in refusing to reshow the video.

#### b. *Hospital Tape*

The hospital tape was made by a local TV station. It showed a dirty, bloody, angry, handcuffed Graham in the hospital emergency room. The prosecution's explanation of the tape's relevance is that it "explains why gunshot residue tests made thereafter could fail to yield a positive result and yet appellant could have fired his gun at Officer Russell." The focus of the tape, however, is not on the hands, but on Graham himself. Seeing the defendant a short time after the murder, handcuffed, bloody, and belligerent, would have a very adverse effect on the jury. Thus, it would seem to be very prejudicial. Since the prejudice comes from the way the defendant appears and has little to do with what he did, the prejudice is very unfair. The focus of the video not being on the hands—in fact, the hands are hardly shown—the probative value of the video is questionable. Thus, this video's unfairly prejudicial content vastly outweighs its probative value and should have been excluded under Minn.R. Evid. 403.

■ Error, by itself, however, is not enough to demand a new trial. The error must be shown to have prejudiced the defendant. *State v. Link*, 289 N.W.2d 102 (Minn.1979). Here, considering the great weight of evidence against Graham, it is hard to see how this video could have harmed him. Even if it were not shown, his conviction would seem almost certain. Therefore, the error was harmless.

### 6. *Evidentiary and Discovery Rulings*

The defendant's claims are so numerous, but meritless, that we decline to enumerate. Suffice it to say we find no error.

## CONCLUSION

Defense counsel made numerous attempts to conjure up a scene that did not take place. We decline to give credence to the defense's conjuring when the overwhelming weight of the evidence submitted established beyond all reasonable doubt, indeed, beyond any doubt, that Graham murdered Officer Russell.

Graham had been drinking heavily and was a wanted man. When Officer Russell observed Graham driving, there was something about that driving that raised his suspicions and he followed Graham, who attempted to escape. The chase on, Graham finally spun out into a ditch. The officer blocked Graham's escape with his squad car and got out to approach the appellant who was still in his car. It is immaterial who drew a gun first because the officer had every right to approach that car with caution and with the idea of making an arrest. From the description of the witnesses, all logic supports the state, namely, that the defendant attempted to and did, in fact, shoot the officer in an attempt to escape. There was no evidence whatever to suggest that Graham shot in self-defense. When the wheat is separated from the chaff, there is no question of Graham's guilt.

The conviction is affirmed.