STATE of Minnesota, Respondent,

v.

Vong CHOMNARITH, Appellant.

No. C2–02–106.

Supreme Court of Minnesota.

Jan. 2, 2003.

John M. Stuart, Minnesota State Public Defender, Theodora Gaitas, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Minnesota Attorney General, John B. Galus, Assistant Attorney General, St. Paul, MN, Kenneth Kohler, Nobles County Attorney, Worthington, MN, for Respondent.

## OPINION

ANDERSON, Russell A., Justice.

Appellant Vong Chomnarith appeals his conviction of first-degree premeditated murder in connection with the stabbing death of George Berndt, Jr. Chomnarith challenges the sufficiency of the evidence with regard to premeditation and the propriety of witness identification photographs introduced at trial. We affirm.

Vong and Kongpang Chomnarith were married for over 20 years and had five children. They emigrated from Laos to the United States, settling first in Stockton, California. In 1997, the Chomnariths moved to Worthington, Minnesota, where they purchased a home and found employment at the Swift and Company meat-processing plant. Kongpang worked as a meat cutter, and George Berndt, Jr. was her immediate cut supervisor. The Chomnariths divorced in September 1999. In accordance with the final divorce decree, Kongpang received title to the family's residence (the "residence") in Worthington. After the divorce, Kongpang entered into a romantic relationship with Berndt and moved into his house. Chomnarith eventually took another job in Sioux Falls, South Dakota, returning periodically to Worthington on the weekends to visit the children.

On March 17, 2001, Kongpang held a birthday party at the residence for her youngest child. Berndt did not plan to attend. On the day of the party, Berndt drove Kongpang to the residence and left. The agreement between the two was that Kongpang would call Berndt when she was ready to leave the residence. Kongpang's mother invited Chomnarith to the party. He took an active role by hiring a traditional Laotian music ensemble and cooking food. More than 50 Laotian friends and family members attended the party.

Around midnight, as the party was ending, Chomnarith helped the musicians load their equipment into a van. Berndt arrived at the residence driving Kongpang's green van. At some point, Chomnarith and Berndt encountered each other in the

driveway, where Chomnarith stabbed Berndt several times. Berndt fell to the ground and crawled into the street. Chomnarith entered the residence holding a bloody knife in his right hand. He had blood on his hands, clothes, and face. He told two guests that he had killed Berndt. Chomnarith washed the bloody knife in the sink, placed it in a kitchen drawer, then went upstairs and washed and changed his clothes.

Meanwhile, police responded to a radio dispatch placed at 1:11 a.m. and, upon arrival at the residence, found Berndt lying in the middle of the street in a pool of blood. The police believed Berndt was the victim of a hit-and-run car accident and, after rendering first aid, placed him in an ambulance. Berndt was transported to the hospital where he was pronounced dead at 1:47 a.m. A preliminary examination at the hospital showed he had died of stab wounds. The officers at the residence then began a homicide investigation that led to Chomnarith's arrest.

During a search of the residence, police recovered a knife from a kitchen drawer. The knife, used in the meat-packing industry to skin and separate flesh from bone, had a six-inch blade and a black plastic handle. Kongpang identified the knife as one she had brought from the Swift plant to the residence during a locker-cleaning procedure at the plant. She had not returned the knife despite her employer's instructions to do so. Subsequent DNA tests matched traces of blood on the knife to Berndt's DNA type.

Chomnarith was charged by indictment with first-degree premeditated murder, Minn.Stat. §§ 609.185(1) (2000), 609.11 (2000), second-degree intentional murder, Minn.Stat. §§ 609.19, subd. 1(1) (2000), 609.11, and second-degree felony murder, Minn.Stat. §§ 609.19, subd. 2(1) (2000), 609.11. Following a contested omnibus hearing, the trial court granted Chomnarith's motion to suppress statements he made to the police on the grounds that he had not validly waived his *Miranda* rights. At trial, the state moved to introduce into evidence individual photographs of each Laotian witness, identified by name.[1] Over Chomnarith's objection that the photographs would unnecessarily emphasize the race of the defendant and the witnesses in comparison to the victim, the court granted the state's motion on the condition that the state introduce similar photographs of all state witnesses.

During trial, the state offered into evidence individual photographs of Laotian witnesses after each witness authenticated his or her photograph. In contrast, the state offered into evidence individual photographs of its nonLaotian witnesses in two groups, representing to the court that the photographs were of the witnesses identified by name. The photographs of the state's witnesses were all the same size, all in color, and all the names were printed in the same font above the photographs. The trial court's order allowed Chomnarith to introduce photographs of his witnesses, but Chomnarith's sole witness declined to be photographed.

1. In support of allowing the photographs, the prosecutor stated:

Those, Your Honor, are current photographs of several of the witnesses who will testify in this case. * * * I believe all of them are Laotian and, Your Honor, the purpose of offering these current photographs, and you will note that it's not only a photograph, but it also has the person's name on the top, I can tell the Court from my own personal experience reading through this case for the past six-odd months and preparing for trial that sometimes it's very difficult to keep people's names straight when you are not particularly familiar with certain types of pronunciations and spellings. * * * What this does is associates a name with a face.

The forensic pathologist who conducted the autopsy of Berndt's body testified at trial that he found nine stab wounds, four of which were deep stab wounds in critical areas: one in the middle of the upper back, another under the arm, another near the collar bone, and another below and behind the right ear. The wound under the arm had a six-inch wound track and left a bruising pattern, suggesting that the assailant inserted the knife all the way to the handle in a forceful manner. The wound near the collar bone severed the victim's subclavian artery, which typically results in a significant loss of blood and a loss of consciousness within seconds. The victim also appeared to have various bruises and abrasions on his face. A toxicology report indicated that the victim's blood-alcohol level was .11 percent. The pathologist noted that the blood-alcohol level was most likely higher at the time of death.

The jury found Chomnarith guilty as charged. The trial court entered judgment of conviction for first-degree premeditated murder and sentenced Chomnarith to life in prison. This appeal followed.

## I.

 Chomnarith contends that the evidence of premeditation was insufficient to support the conviction of first-degree murder. In reviewing a claim of evidentiary insufficiency, we view the evidence in a light most favorable to the verdict and assume the fact-finder disbelieved any testimony conflicting with that verdict. *State v. Thomas*, 590 N.W.2d 755, 757 (Minn. 1999). The verdict will not be overturned if, giving due regard to the presumption of innocence and to the prosecution's burden of proving guilt beyond a reasonable doubt, the jury could reasonably have found the defendant guilty of the charged offense. *Id.* at 757–58. Circumstantial evidence is entitled to the same weight as

any other evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of guilt. *State v. Jones*, 516 N.W.2d 545, 549 (Minn.1994). The conviction may stand only where the circumstances form " 'a complete chain which, in light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt.' " *Id.* (quoting *State v. Wahlberg*, 296 N.W.2d 408, 411 (Minn.1980)).

 A person who "causes the death of a human being with premeditation and with intent to effect the death of the person or of another" is guilty of first-degree murder. Minn.Stat. § 609.185(1) (2002). Chomnarith argues that the state's evidence of premeditation was insufficient to support his conviction. Under the criminal code, premeditation means "to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn.Stat. § 609.18 (2002). Premeditation is a state of mind and, thus, generally proven through circumstantial evidence. *State v. Cooper*, 561 N.W.2d 175, 179 (Minn.1997). "A finding of premeditation does not require proof of extensive planning or preparation to kill, nor does it require any specific period of time for deliberation." *Id.* at 180. The state, however, must prove that before the commission of the act, some appreciable amount of time elapsed during which the defendant considered, planned, or prepared for his or her actions. *State v. Moore*, 481 N.W.2d 355, 361 (Minn.1992).

 Evidence relevant to premeditation includes " 'facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, *planning activity*.' " *Id.* (emphasis in original)

(quoting Wayne R. LaFave & Austin W. Scott, Jr., *Handbook on Criminal Law* § 73, at 564–65 (1972)). Accordingly, premeditation may be inferred from evidence of " 'prior possession of the murder weapon.' " *Id.* (quoting LaFave & Scott, *supra* ); *see, e.g., United States v. Blue Thunder*, 604 F.2d 550, 553–54 (8th Cir.1979) (defendant brought butcher knife used as murder weapon to the murder scene); *Bangert v. State*, 282 N.W.2d 540, 544 (Minn.1979) (defendant carried gun from one area of the house, down a hallway, and into the bedroom of sleeping victims); *State v. Merrill*, 274 N.W.2d 99, 112 (Minn.1978) (defendant carried knife from kitchen to wounded victim's bedroom).

▬▬▬ Other evidence relevant to premeditation includes " 'facts about the *nature of the killing,* from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.' " *Moore*, 481 N.W.2d at 361 (quoting LaFave & Scott, *supra* ). Thus, premeditation may be inferred from evidence showing that " 'wounds were deliberately placed at vital areas of the body.' " *Id.* (quoting LaFave & Scott, *supra* ); *see, e.g., United States v. Treas–Wilson*, 3 F.3d 1406, 1410 (10th Cir. 1993) (precise and fatal injury severing the esophagus, trachea and large veins of the neck); *United States v. Slader*, 791 F.2d 655, 657–58 (8th Cir.1986) (two shots to the back of the head); *Merrill*, 274 N.W.2d at 112, n. 11 (multiple stab wounds to vital areas of the body).

▬▬▬ Here the evidence showed that Chomnarith obtained an industrial grade meat-cutting knife from the residence and had it with him at the mouth of the driveway where he inflicted precise wounds to vital areas of Berndt's body, including puncturing the lung, penetrating a rib bone, and transecting the subclavian ar-

tery. Viewed in a light most favorable to the verdict, we conclude that the totality of the evidence clearly supports the jury's finding of premeditation and guilt of first-degree murder.

## II.

▬▬▬ Chomnarith also asserts that the admission of individual photographs of the state's witnesses and the method by which the photographs were offered into evidence violated his constitutional rights to a fair trial and an impartial jury. *See* U.S. Const. amends. VI, XIV; Minn. Const. art. 1, §§ 6, 7. Rulings on evidentiary matters rest within the sound discretion of the trial court, and we will not reverse such evidentiary rulings absent a clear abuse of discretion. *State v. Nunn*, 561 N.W.2d 902, 906–07 (Minn.1997). The defendant has the burden on appeal of proving both that the trial court abused its discretion by admitting the evidence and that the defendant was thereby prejudiced. *Id.* at 907. "Reversal is warranted only when the error substantially influences the jury's decision." *Id.* For constitutional error, however, the inquiry is whether the guilty verdict actually rendered was surely unattributable to the error. *State v. Juarez*, 572 N.W.2d 286, 292 (Minn.1997) (citing *Sullivan v. Louisiana*, 508 U.S. 275, 278–82, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993)).

▬▬▬ Photographs are generally admissible as evidence if they " 'accurately portray anything which it is competent for a witness to describe in words, or where they are helpful as an aid to a verbal description of objects and conditions, provided they are relevant to some material issue' ". *State v. Alton*, 432 N.W.2d 754, 758 (Minn.1988) (emphasis in original) (quoting *State v. DeZeler*, 230 Minn. 39, 46–47, 41 N.W.2d 313, 319 (1950)). Chomnarith argues that the photographs of the

trial witnesses were not relevant to any material issue. In response, the state argues that the photographs were relevant to the extent that they assisted the jury in remembering the testimony of each witness, and cites *State v. Lane*, 582 N.W.2d 256, 259 (Minn.1998), *State v. Barbo*, 339 N.W.2d 905, 906 (Minn.1983), and *State v. Ming Sen Shiue*, 326 N.W.2d 648, 653 (Minn.1982), cases in which the jury, during its deliberation, was allowed in the courtroom to rehear portions of testimony and review audiotape or videotape evidence. These cases, however, simply concern the propriety of granting a jury's request under Minn. R.Crim. P. 26.03, subd. 19(2) to return to the courtroom and review testimony or other evidence relevant to material issues.

We have, of course, allowed police identification photographs, or "mug shots," of defendants when identification is a key issue. *State v. McAdoo*, 330 N.W.2d 104, 106 (Minn.1983). We have also allowed photographs showing that " '[t]he victim was not just bones and sinews covered with flesh, but was imbued with the spark of life.' " *State v. Day*, 619 N.W.2d 745, 752 (Minn.2000) (quoting *State v. Graham*, 371 N.W.2d 204, 207 (Minn.1985)). But we have never condoned the admission of posed photographs of trial witnesses in a criminal matter for the sole purpose of allowing the jury to take them to the jury room in order to associate a name with a face, and the state has provided no authority for doing so.

 We have strong reservations about the practice of creating trial witness identification photographs solely for jury deliberations. The trial court instructs the jurors that they are "the sole judges of whether a witness is to be believed and of the weight to be given to the particular

testimony." 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 3.12 (4th ed.1999). In determining the believability and weight of a witness's testimony, jurors consider, for example, the "manner" in which the witness testified and also the witness's "frankness and sincerity, or lack thereof." *Id.* The manner of testimony and the sincerity of a witness can best be assessed, we believe, by observation, not by a single posed photograph produced by the state.

 Additionally, the method by which the photographs were offered and received is troublesome. We are concerned that the dissimilar means by which the photographs were offered at Chomnarith's trial impermissibly placed race or bias in the courtroom, thereby "inviting [the] jurors to view [the] defendant as coming from a different community than themselves." *State v. Varner*, 643 N.W.2d 298, 304 (Minn.2002). Under due process analysis, when racial comments raise serious questions of possible prejudice, "the relevant question" is whether the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Pickens v. Lockhart*, 4 F.3d 1446, 1453 (8th Cir.1993) (improper references to races of victims did not deprive petitioner of fair resentencing hearing) (citations and internal quotations omitted); *see Varner*, 643 N.W.2d at 306 (race-based juror misconduct warranted a new trial). Under this standard, the state's method of offering the photographs into evidence, which clearly differentiated between the Laotian and nonLaotian witnesses, was improper. Although improper, it was not so egregious as to deprive Chomnarith of a fair trial, particularly where there was no objection from defense counsel as to the specific method of submission at trial.[2]

**2.** It is true, as the state notes, issues not raised at trial will not be decided on appeal.

Likewise, we conclude that the admission of trial witness identification photographs for jury deliberations was improper. On this record, however, this error was also harmless. See *Juarez*, 572 N.W.2d at 292–93.

Affirmed.

## CONCURRENCE

GILBERT, Justice (concurring).

I concur with the result reached by the majority. I agree with the holding that the admission of trial witness identification photographs for jury deliberations was improper. However, I would respectfully end the opinion with that holding and eliminate the dicta based on supposition and speculation relating to issues that were not properly raised at the trial court level. My concern relates to editorial comments about "tacit racial comment" that did not occur and to the method by which the pictures were offered at trial when no objection as to method occurred during trial. Dicta such as this weakens our jurisprudence and encourages trial lawyers to sit on their hands rather than raise appropriate and timely objections. This deprives the trial court of the opportunity to correct errors as they occur and inappropriately rewards appellate lawyers for creatively coming up with new theories of

objection long after trial when no adequate record was made.

*Roby v. State*, 547 N.W.2d 354, 357 (Minn. 1996). But an appellate court also has a " 'responsibility to review the record even though assignments of error are inadequate' " when the interests of justice so require. *See State v. Post*, 512 N.W.2d 99, 103 (Minn.1994) (quoting *State v. Peterson*, 266 Minn. 77, 83, 123 N.W.2d 177, 182 (1963)). Racial or ethnic bias in the courtroom "must be confronted whenever improperly raised in judicial proceedings." *Varner*, 643 N.W.2d at 305. Certainly it can be inferred the state had no intention of making improper use of race given the importance of the credibility of its own witnesses. Nonetheless, the method by which

the photographs of these witnesses was offered and received raised serious questions of impermissible tacit racial comment. As for the concern expressed in the concurring opinion that our discussion is mere dicta, the question of racial prejudice was directly involved with the admission of the photographs in the first instance and argued by counsel on appeal. "[T]here is a distinction between 'obiter dictum' and 'judicial dictum,' the latter constituting an expression emanating from the judicial conscience and the responsibilities that go with it." *State v. Rainer*, 258 Minn. 168, 178, 103 N.W.2d 389, 396 (1960).