STATE of Minnesota, Respondent,

v.

Daniel James VALTIERRA, Appellant.

No. A05–919.

Supreme Court of Minnesota.

July 27, 2006.

Bradford Colbert, Legal Assistance to Minnesota Prisoners, St. Paul, MN, for appellant.

Michael Hatch, Attorney General, Susan Gaertner, Ramsey County Attorney, Mark Nathan Lystig, Asst. Ramsey County Attorney, St. Paul, MN, for respondent.

## OPINION

MEYER, Justice.

Following a jury trial in January 2005, appellant Daniel James Valtierra was convicted of two counts of first-degree felony murder and one count of attempted first-degree felony murder for the shooting deaths of Ron Glasgow and Wayne Costilla, and for the shooting of Andria Crosby. In this direct appeal, Valtierra argues that the district court's jury instructions were improper both because the jury was instructed that guilt could be inferred from the fact that Valtierra fled the state and because the jury instruction on accomplice liability described an improper objective standard. Valtierra contends that these improper instructions deprived him of his right to a fair trial. Valtierra also argues that the district court made evidentiary errors by allowing the state to introduce expert police testimony regarding "triangulation," and by allowing the state to inquire into the underlying facts regarding Valtierra's prior conviction. Finally, Valtierra argues that there was insufficient evidence to prove that the shootings of Glasgow, Costilla, and Crosby were reasonably foreseeable as a probable consequence of committing aggravated robbery. While we agree that the district court committed certain errors, we conclude that these errors did not deprive Valtierra of a fair trial, and that there was sufficient evidence to support Valtierra's conviction. We therefore affirm.

Early in the morning on January 12, 2004, Wayne Costilla, Ron Glasgow, and Andria Crosby were all shot during a drug robbery in Costilla's apartment in Saint Paul. Glasgow was shot in the head and chest and died at the scene. Costilla was shot in the head and neck, and died later at the hospital. But Crosby, shot in her torso and through her left leg, survived. All three were shot by Michael Medal–Mendoza, who was accompanied during the shooting by James Green and appellant Daniel Valtierra. At trial, Crosby and Valtierra were the only witnesses of the shooting who testified.

Crosby testified that on the night of the shooting, she was with her boyfriend Glasgow in a room at an extended-stay hotel, along with their friend Costilla. The three were playing video games and dominoes, and using drugs. Crosby smoked methamphetamine and marijuana, and also took some Valium. Glasgow and Costilla both used methamphetamine. That evening, Costilla received a telephone call from a caller looking to buy some methamphetamine for some people who were visiting from out of town. Crosby and Glasgow, who were in the business of selling methamphetamine, agreed to sell an ounce to Costilla for $1,600. Costilla in turn told the caller he would sell the ounce for $1,800 or $1,900. The transaction was originally to have taken place at an Amoco gas station, but the group was concerned about arousing suspicion, so they changed the location to Costilla's apartment.

At about 1:30 a.m., the caller, who Crosby later learned was James Green, arrived at Costilla's apartment. Green was friendly, and after discussing the transaction and conversing for 15 to 20 minutes, Green left the apartment with a sample bag of methamphetamine. When Green came back, Medal–Mendoza and Valtierra were with him. According to Crosby, the group was there for about 15 minutes discussing the transaction, during which time Valtierra

sat silently on the couch, "way too close" to Glasgow. Green, Valtierra, and Medal–Mendoza then left, saying that they needed to meet the people from out of town at the Amoco station to give them the sample bag and get money.

Crosby testified that about 30 minutes after Green, Valtierra, and Medal–Mendoza had left, the three men came back into Costilla's apartment. Medal–Mendoza came in first, brandishing a "big, silver gun." Green and Valtierra came in together after Medal–Mendoza, making a V formation behind him. Crosby testified that she was sure that both Green and Valtierra also had guns. Medal–Mendoza pointed his gun at Glasgow and said:

> Medal–Mendoza: "I am robbing you, * * *."
>
> Glasgow: "You ain't robbing me, * * *."
>
> Medal–Mendoza: "I will shoot you."
>
> Glasgow: "Well, you are going to have to shoot me then because you sure the hell ain't going to rob me."

Medal–Mendoza then shot Glasgow in the head. Crosby was "in shock" and began pleading, "No, * * * not my baby." She did not know who was shot next, but Medal–Mendoza kept shooting. Crosby felt a gunshot in her left thigh and dropped to the floor. After several gunshots were fired, Green, Valtierra, and Medal–Mendoza left. Crosby stayed on the floor, and about 5 minutes later one of the men came back and nudged her with his foot to make sure she was dead. She laid still, and the man grabbed her purse and again left. Once Crosby was sure the three men were gone for good, she began screaming and called 911.

At trial Valtierra testified in his own defense and presented a different account of the shooting. Valtierra testified that early on the morning of January 12, Green and Medal–Mendoza went out to buy methamphetamine, and he went with them

to buy cigarettes. Before getting the methamphetamine or cigarettes, the group stopped at a Perkins restaurant. Valtierra did not want to eat, so he left the other two at Perkins, got cigarettes, and began walking back to his sister's apartment, where he had been staying. As he walked back, Green and Medal–Mendoza pulled up alongside him in a car. Valtierra testified that Green insisted that Valtierra join them in the car instead of walking back in the cold, and after Valtierra obliged, Green explained that they were just going to make a brief 5– or 10–minute stop to get Medal–Mendoza some methamphetamine.

When the group arrived at Costilla's apartment, Green went in alone, and then all three went into the apartment after Green came back to the car with a sample bag of methamphetamine. Valtierra testified that after the three left the apartment and returned to the car, Medal–Mendoza complained that the asking price for the methamphetamine was too high and suggested that they return to the apartment to attempt to negotiate a lower price. Valtierra testified that he did not think that Green and Medal–Mendoza intended for him to go with them, but since he had come into the apartment the previous time, Valtierra decided to join them again.

Though Crosby testified that Valtierra and Green came in right after Medal–Mendoza, Valtierra testified that Green and Medal–Mendoza got a head start and that he entered the apartment several seconds after they did, just in time to hear someone say "shoot me" and to see Medal–Mendoza pointing a gun at Glasgow. Valtierra then saw Medal–Mendoza fire one shot into Glasgow's chest, and another into his forehead. Though Crosby claimed that all three men had guns, Valtierra testified that he did not have a gun himself, and that he did not know that Medal–Mendoza had been carrying a gun, or that he was

going to shoot anyone. Valtierra testified that he remembered Crosby getting shot and Green running out of the apartment. While Medal–Mendoza fired more shots, Valtierra followed Green out of the apartment.

After fleeing Costilla's apartment, Valtierra ran to the home of Green and Green's girlfriend, Alison, and there rejoined Green. Valtierra decided to attempt to use a previously purchased plane ticket for a flight back to his home in Seattle, which was scheduled to depart later that morning. But Valtierra encountered a problem with his ticket at the airport, and instead decided to drive with Medal–Mendoza and Green to New York, where they could stay with Medal–Mendoza's family.

At about 11:45 a.m. on the day of the shooting, Green, Valtierra, and Medal–Mendoza left Saint Paul, and drove Medal–Mendoza's car as far as Chicago, where they stopped at a motel. Valtierra testified that he decided that night that he should not be "running for something [he] didn't do." In the morning, Valtierra told the other two he wanted to return to Saint Paul. Green agreed and made a phone call to a person he knew on the gang task force of the Saint Paul police.

Valtierra, Green, and Medal–Mendoza then began driving back to Saint Paul at about 8:45 a.m. on January 13, the day after the shooting. While driving through Wisconsin Medal–Mendoza's car struck the rear corner of a minivan. Medal–Mendoza's car spun out of control and ended up in the ditch.

Valtierra, Green, and Medal–Mendoza left the scene of the accident and went to a nearby road where Medal–Mendoza flagged down the driver of a pickup truck. The pickup driver agreed to give Medal–Mendoza a ride, but was then surprised to see Valtierra and Green come out of the ditch and lay down in his pickup bed. The pickup driver looked around and, seeing people at the scene of the accident looking over, decided not to give the group a ride. Instead, he flagged down a passing police car.

Medal–Mendoza told the police officer his real name, admitted he had been driving, and was taken into custody for driving under the influence. Green at first claimed to be "Bobby Green," and Valtierra claimed to be "Jason Andrew Castillo." Both were treated at the hospital and then released from police custody.

Back in Saint Paul, police were talking to Crosby, who had recognized Green from high school and identified him from a picture in a high school yearbook. By the afternoon of January 13 (when the traffic accident occurred in Wisconsin), Saint Paul police had connected Green, Valtierra, and Medal–Mendoza to the shooting, and Crosby had picked all three men out of photo lineups. After learning that warrants had been issued for the arrest of the three men, Wisconsin police informed Saint Paul officers that they had Medal–Mendoza in custody, but that they had already released Green and Valtierra.

Valtierra testified that he returned to St. Paul to turn himself in, but police instead arrested Valtierra about 2–1/2 hours after his return to Saint Paul. In an interview with an investigator immediately following his arrest, Valtierra indicated that he had probably had only 12 hours of sleep over the preceding 15 to 20 days because he had been doing "s* * *" constantly.[1] Valtierra told the investigator that he was surprised that Crosby had been able to identify him, since he had been wearing a baseball cap at the time of the murders. Valtierra also told the inves-

---

1. At trial Valtierra denied that he had used drugs prior to the shooting.

tigator that he was angry that Green and Medal–Mendoza had talked about the murder to other people, because "if someone does a murder, you are never supposed to tell nobody."

Crosby gave police statements in the period following the shooting that were largely consistent with her subsequent recounting of events at trial. These statements to police were related to the jury by Sergeant Janet Dunnom, who testified that Crosby told her that Valtierra and Green came into Costilla's apartment after Medal–Mendoza and that all three men were wielding guns. On cross-examination Crosby was asked questions related to her ability to perceive and remember the events surrounding the shooting. She testified that the methamphetamine she had taken had made her awake more than it had made her high.

The jury found Valtierra guilty on all charged counts, and the judge convicted and sentenced him on two counts of first-degree felony murder and one count of attempted first-degree felony murder, leading to this appeal.

### I.

■ Valtierra argues that two of the district court's jury instructions were improper. First, Valtierra argues that the district court erred by instructing the jury that evidence showing that Valtierra fled after the shooting could be used to infer that Valtierra possessed a guilty mind.[2] In a 1957 decision, this court cautiously permitted a similar jury instruction. *State v. McLaughlin*, 250 Minn. 309, 317–19, 84

N.W.2d 664, 671–72 (1957). But in two more recent cases, we have instructed that district courts should avoid "jury instructions advising that a particular fact may be inferred from other particular facts, if proved." *State v. Litzau*, 650 N.W.2d 177, 186–87 (Minn.2002) (holding that the trial court erred by giving an instruction that the jury could infer that the driver of a vehicle possessed a drug found in his vehicle, and holding that the "cumulative effect" of this error and others merited reversal); *see also State v. Olson*, 482 N.W.2d 212, 215–16 (Minn.1992) (holding that the trial court erred in instructing the jury that possession could be inferred from close proximity to illegal drugs, and that this error merited reversal). *Litzau*, which echoed the reasoning articulated in *Olson*, laid out several reasons for disfavoring permissive-inference instructions generally:

> Such instructions are undesirable in that they tend to inject argument into the judge's charge and lengthen it unnecessarily. Such instructions also improperly influence the jury not only by isolating particular facts but also by giving a particular step of logic the official legal imprimatur of the state.
>
> * * * *
>
> Permissive inferences * * * permit juries to avoid assessing the myriad facts which make specific cases unique.

*Litzau*, 650 N.W.2d at 186 (second alteration in original) (internal citations and quotations omitted). *Litzau* also noted that

---

2. The trial judge instructed the jury:

 It is for you alone to decide whether or not the defendant fled after the alleged crimes. If you determine that he did flee, then you may take such flight into consideration as an inference of guilty intention at the time of the incident giving rise to these charges.

 Flight in itself is not conclusive evidence of a guilty intent; but if you find such flight existed, then you may consider it along with all of the other pertinent evidence in this case in determining whether or not the State has established that the defendant possessed the requisite intent at the time and place of the alleged crime.

permissive-inference instructions are also unnecessary in that if the rational connection between facts presented and facts inferred is derived from common sense and experience, the matter can normally be left to the jury's judgment upon general instructions.

*Id.* at 186 n. 7 (internal citation and quotation omitted).

*Litzau* and *Olson* both dealt with inferences relating to drug possession, but the state presents no compelling reason to treat a flight instruction any differently. Flight instructions are a species of permissive-inference instruction, and the factors leading us to reject such instructions in *Litzau* and *Olson* apply with equal force to flight instructions. *Cf. Litzau,* 650 N.W.2d at 186 & n. 7, 187; *Olson,* 482 N.W.2d at 215–16; *see also State v. Oates,* 611 N.W.2d 580, 584 (Minn.App.2000) ("There is no need to instruct the jury that a [suspect] fleeing the scene is displaying a 'consciousness of guilt.' "). Therefore, we hold that the district court erred by instructing the jury on the permissive inference that may be drawn from evidence of flight.

■ Erroneous jury instructions merit a new trial "if it cannot be said beyond a reasonable doubt that the error had no significant impact on the verdict." *Olson,* 482 N.W.2d at 216. In *Olson,* we held that an improper jury instruction may have had a significant impact on the verdict, and therefore reversal was warranted when the jury was instructed that "knowing possession" of drugs could be inferred from the defendant's proximity to drugs when the drugs were found. *Id.* In *Olson,* knowing possession was the critical element of the offense, and the defendant's proximity to the drugs was not just the critical piece of evidence of knowing possession, it was the *only* evidence of knowing possession. *See Olson,* 482 N.W.2d at

213–14. Thus, the permissive inference instruction in *Olson* was central to the jury's deliberations, and therefore it could not be said beyond a reasonable doubt that the instruction did not have a significant impact on the verdict. *See Olson,* 482 N.W.2d at 215–16.

Unlike in *Olson,* the erroneous flight instruction in this case was neither the only evidence of Valtierra's guilt nor the most compelling, and we conclude that the instruction did not have a significant impact on the verdict. By far the most powerful evidence of Valtierra's guilt was Crosby's testimony that Valtierra came into Costilla's apartment wielding a gun, and the supportive testimony by Sergeant Dunnom that Crosby told the sergeant the same thing immediately following the shooting. Moreover, the fact that Valtierra reversed his flight by returning to Saint Paul supports his argument, mitigating any harm that may have resulted from unduly focusing the jury on flight. Finally, we note that the flight instruction in this case neither misstated substantive law nor improperly suggested that the jury was compelled to make the inference in question; instead, the fault of this instruction was merely to place undue emphasis on one among several permissible inferences. Such undue emphasis may require reversal in some cases, but here Valtierra's guilt was independently supported by strong evidence and the evidence of flight was partly supportive of Valtierra's defense. We conclude that, beyond a reasonable doubt, the jury instruction on flight did not have a significant impact on the verdict.

■ Valtierra also argues that the district court erred by giving the standard jury instruction on accomplice liability, which states that the underlying crime must have been "reasonably foreseeable," not "reasonably foreseeable *by the per-*

*son,*" which is the language of the accomplice liability statute. Minn.Stat. § 609.05, subd. 2 (2004); 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 4.01 (4th ed.1999) (amended in 2006 supplement to read "reasonably foreseeable to the defendant"). This same claim of error was dealt with recently in *State v. Earl,* 702 N.W.2d 711 (Minn.2005). We held in *Earl* that giving the standard jury instruction on accomplice liability was not error. *Id.* at 722. But we also said, "to avoid the necessity of dealing with this issue in the future, we suggest that all future instructions on accomplice liability use the entire statutory phrase 'reasonably foreseeable to the person.'" *Id. Earl's* suggestion to use the entire statutory phrase does not apply to this case since Valtierra's trial was conducted before our decision in *Earl,* and was not, therefore, a "*future* instruction[ ] on accomplice liability." *Id.* (emphasis added). The result here is identical to the result in *Earl,* which held that giving the standard instruction was not error. *See Earl,* 702 N.W.2d at 722; *see also State v. White,* 684 N.W.2d 500, 509 (Minn.2004) (holding that jury instructions virtually identical to the ones used in this case, when read as a whole, did not confuse or mislead the jury or materially misstate the law); *State v. Peirce,* 364 N.W.2d 801, 809–10 (Minn.1985) (holding that the "reasonable foreseeability" test for accomplice liability did not allow jurors to return a verdict on something less than proof beyond a reasonable doubt).

## II.

▮ We turn to Valtierra's two claims of evidentiary error. First, Valtierra argues that the district court erred by allowing, over defense counsel's objections, Sergeant Dunnom to testify that Valtierra, Green, and Medal–Mendoza used "triangulation." Dunnom, who testified primarily about her conversations with Crosby after the shooting, also gave some expert testimony regarding the generally dangerous nature of drug dealing and in particular about triangulation. Dunnom explained:

When taking narcotics class to prepare to be an undercover agent, you are taught that * * * the most dangerous time of a drug deal is when the money and the drugs come together. If you are buying or selling, it doesn't matter; but as an undercover police officer, the term triangulation referred to multiple sellers or buyers that—and the triangulation just simply means shape of a triangle. That means they split so that your attention can't be on just one person, that they split and they are out of your line of sight.

Dunnom said that when there is triangulation, "at best, [the triangulators] are there to rob you," and "[a]t worst, they are there to kill you and take the drugs and money." Dunnom then testified that in her opinion triangulation was a part of Valtierra's case. Valtierra argues that Dunnom's testimony amounted to impermissible expert testimony on the ultimate issue of guilt since Dunnom testified (1) that triangulation occurred, and (2) that triangulation means that the triangulators are either going to rob or kill someone.

▮ Evidentiary rulings "'rest within the sound discretion of the trial court, and we will not reverse such evidentiary rulings absent a clear abuse of discretion.'" *State v. Morton,* 701 N.W.2d 225, 234 (Minn.2005) (*quoting State v. Sanchez–Diaz,* 683 N.W.2d 824, 835 (Minn.2004)). Generally, testimony that is "otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Minn. R. Evid. 704. But "opinions involving a legal analysis or mixed questions of law and fact * * * are not deemed to be of any use to the trier of

fact." Minn. R. Evid. 704 comm. cmt.—1977. Therefore, regardless of whether expert testimony embraces an ultimate issue, "[t]he 'ultimate question of admissibility' for expert testimony is whether the expert's testimony will help the trier of fact in evaluating evidence or resolving factual issues." *State v. DeShay,* 669 N.W.2d 878, 884 (Minn.2003) (quoting *State v. Koskela,* 536 N.W.2d 625, 629 (Minn.1995)).

The evidence of triangulation in this case was clearly not helpful to the jury. As the state admits on appeal, triangulation did not, in fact, occur in the sense Dunnom described. Although Crosby testified that Valtierra, Green, and Medal–Mendoza were in a triangle-shaped formation, they were grouped together, not spread out so as to divert the attention of Glasgow, Costilla, and Crosby. Further, even if triangulation as defined by Dunnom had occurred, it is doubtful that expert testimony on this "tactic" would have been helpful to the jury. Questions regarding the intent of assailants who surround and divert the attention of their intended victims "can be resolved by applying principles of general or common knowledge," and it was therefore not helpful to the jury to have expert testimony on the topic. *Id.* at 885 (quotation marks omitted). For these reasons, the district court abused its discretion by permitting Dunnom to testify about triangulation.[3]

 Evidentiary errors, such as errors in admitting expert testimony, warrant a new trial " 'only when the error substantially influences the jury's decision.' " *DeShay,* 669 N.W.2d at 888 (quoting *State v. Chomnarith,* 654 N.W.2d 660, 665 (Minn.2003)).[4] Though the expert testimony on triangulation was erroneous and unnecessary, it appears that the jury was well-positioned to judge it for its minimal worth. The jury heard that the officer's experience with the case was•based on her conversations with Crosby, and heard that the basis of the officer's experience was her police training. Therefore, unlike in many expert witness situations, the reasoning behind Dunnom's expert testimony was not mysterious to the jury. Further, as noted above, because this case hinged on Crosby's testimony that Valtierra had wielded a gun at Costilla's apartment, the triangulation testimony was unlikely to substantially influence the jury's decision. We conclude that Dunnom's erroneously admitted testimony about triangulation was harmless error.

 Valtierra also argues that the district court erred by allowing the state to ask him on cross-examination about the specific facts underlying his prior conviction for aggravated robbery. At trial, evidence of Valtierra's prior conviction was introduced, without objection, as impeachment evidence under Minn. R. Evid. 609(a). Valtierra then objected to inquiry into the underlying facts of this prior crime, but the district court ruled that Valtierra's own testimony had essentially

3. Valtierra also argues that the foundation for Dunnom's expert status—which consisted of her testimony that she had done undercover narcotics work and had been taught about triangulation during her police training—was insufficient. Because we hold that Dunnom's testimony on triangulation was otherwise improper, we do not reach the issue of whether the testimony was supported by sufficient foundation.

4. For constitutional error, "the inquiry is whether the guilty verdict actually rendered was surely unattributable to the error." *Chomnarith,* 654 N.W.2d at 665. Here, Valtierra does not argue that the error affected his constitutional rights, so we inquire only whether the verdict was substantially influenced by the error. *See DeShay,* 669 N.W.2d at 888.

"opened the door" to underlying-facts evidence.

A witness may be impeached with evidence of a prior conviction only if the conviction was a felony or if the conviction involved dishonesty. Minn. R. Evid. 609(a). But normally, even if a prior conviction is properly introduced as impeachment under Rule 609, "the prosecutor may not elicit evidence concerning the facts underlying [the] prior conviction[ ]." *State v. Edwards*, 343 N.W.2d 269, 273 (Minn. 1984); *State v. Norgaard*, 272 Minn. 48, 51, 136 N.W.2d 628, 631 (1965). Examination regarding prior convictions "should be limited to the fact of the conviction, the nature of the offense, and the identity of the defendant." *Norgaard*, 272 Minn. at 51, 136 N.W.2d at 631.

But the underlying-facts exclusion is not an iron-clad rule, and we have held that " 'the scope of * * * cross-examination [regarding prior convictions] must be left largely to the discretion of the [trial] court depending upon the circumstances.' " *State v. Griese*, 565 N.W.2d 419, 426 (Minn.1997) (second alteration in original) (quoting *Norgaard*, 272 Minn. at 51, 136 N.W.2d at 631) (the district court was within its discretion allowing underlying-facts evidence against defense's expert psychiatrist when the "prior convictions relate[d] directly to the substance of the witness's testimony"). In particular, district courts may permit inquiring into underlying facts when the defendant "opens the door." "Opening the door" occurs when "one party by introducing certain material * * * creates in the opponent a right to respond with material that would otherwise have been inadmissible." 8 Henry W. McCarr & Jack S. *Nordby, Minnesota Practice—Criminal Law and Procedure* § 32.54 (3d ed.2001).[5] The opening-the-door doctrine "is essentially one of fairness and common sense, based on the proposition that one party should not have an unfair advantage * * * and that the factfinder should not be presented with a misleading or distorted representation of reality." *Id.* The doctrine must be applied cautiously, however, especially when it is being used to impeach a criminal defendant. *See id.* If underlying-facts evidence is introduced against an accused, "there is a unique possibility of prejudice: to allow broad inquiry into the facts underlying a prior conviction might confuse the issues before the jury or have a chilling effect on the accused's right to testify in his own defense." *Griese*, 565 N.W.2d at 426.

In support of the district court's ruling that Valtierra opened the door to cross-examination on a prior aggravated robbery conviction, the state points to two instances of trial testimony in which Valtierra "tak[es] full responsibility" for his prior crimes. First, Valtierra was asked

---

5. *See State v. Thunberg*, 492 N.W.2d 534, 538 (Minn.1992) (defendant testified on direct that he did not remember stabbing the victim because he had blacked out, and that although he had blacked out on many occasions previously, he had never "been in this kind of situation"; this testimony opened the door for the state to elicit testimony on cross-examination that the defendant also said that he had blacked out in connection with an earlier conviction for aggravated robbery); *Edwards*, 343 N.W.2d at 273 (defendant opened the door to questions about stabbing an off-duty police officer when defendant, during direct examination by his own counsel, testified about having been stabbed and how he therefore was particularly fearful of being stabbed again); *State v. Gardner*, 328 N.W.2d 159, 161 (Minn.1983) (defendant's counsel, by asking a witness on cross-examination about an instance in which the witness attacked the defendant, opened the door for the state to elicit, during its case-in-chief, the underlying facts of a prior conviction which helped explain why the witness had attacked the defendant).

on direct examination about his prior encounters with the law. He admitted to having committed aggravated robbery, third-degree burglary, and providing a false name to the police in 2000. Valtierra's counsel then asked him, "You understand you are responsible for what you did, even though you took drugs [in 2000]?" Valtierra responded: "Yes. I am taking full responsibility for what I did." Second, after testifying about his fear of retaliation for talking to the police, Valtierra's counsel asked him, "[D]o you believe it was stupid [to not go] directly to the police [after the shooting]?" Valtierra answered, in part:

I believe it was very stupid, you know. I regret a lot of my decisions. I take full responsibility for everything I did, though, and I know that even though I didn't know [Medal–Mendoza] had a gun, even though I didn't know he was going to shoot no one * * * but I have to admit I made a conscious decision to get in the car that night * * * to go make this run for this guy to get him this methamphetamine[.]

According to the state's argument and the district court's ruling, this testimony opened the door for the state to pursue the following line of questioning on cross-examination:

Q [The state]:

When you were convicted of first degree aggravated robbery in the year 2000, that was for robbing a Holiday gas station, right?

A [Valtierra]:

Yes. It was.

Q: What "aggravated" means is that you were armed with a dangerous weapon, right?

A: Yes. I take full responsibility for that.

Q: In this case, it was a gun that you were armed with?

[Valtierra's counsel]: I am going to object on the grounds—I want to make a continuing objection.

The court: Overruled.

* * * *

Q: What you were convicted of is robbing a Holiday store with a gun, correct?

A: All I can say is the jury found me guilty and I respect their decision.

Q: But you maintained that you were at the Holiday station. You committed the robbery but didn't have a gun, right?

A: I was convicted. I mean, I did my time and I put it behind me.

Q: That is not my question. What I am asking is if you have admitted to doing the robbery but not having a gun.

A: Yes. I did.

Q: Yes, you did have a gun?

A: No. I never had a gun I just—I am under oath. The only thing I can say is—I took some money out of the store but I never was armed.

Q: But you were convicted of being armed?

A: Yes. I was.

■ The state argues that this exchange was proper because Valtierra's claim that he took responsibility for his past actions opened the door to it. We disagree. First, it is not clear from the testimony cited by the state that Valtierra did, in fact, take full responsibility for the prior crimes for which he was convicted. But assuming he did, it is not clear how taking responsibility for past actions would give Valtierra an "unfair advantage" or allow him to present "a misleading or distorted representation of reality" so as to overwhelm the baseline rule that underly-

ing facts are prohibited. McCarr & Nordby, *supra*, § 32.54. This is particularly true because the admission of underlying-crimes evidence against an accused presents a unique opportunity for prejudice. *See Griese*, 565 N.W.2d at 426. We also believe that permitting the underlying-facts inquiry at issue here—which creates a presumption that a defendant who asserts his innocence and subsequently is convicted is impeachable for being untruthful—would present the sort of "chilling effect on the accused's right to testify in his own defense" that this court cautioned against in *Griese*. *Id.* For these reasons we hold that the district court erred by permitting inquiry into the underlying facts of Valtierra's prior conviction.[6]

 As an evidentiary error not affecting constitutional rights, improperly admitted underlying-facts evidence will not require reversal unless " 'the error substantially influences the jury's decision.' " *Chomnarith*, 654 N.W.2d at 665 (quoting *State v. Nunn*, 561 N.W.2d 902, 907 (Minn. 1997)); *see also Norgaard*, 272 Minn. at 52, 136 N.W.2d at 631 (determining that it was error to inquire into the age of a rape victim after the fact of the rape conviction was properly admitted as impeachment, but that the error was not prejudicial enough to merit reversal). In this case, it is doubtful that any improper influence on the jury from the underlying-facts admission would have gone far beyond the prejudice resulting from the undisputedly proper admission of Valtierra's aggravated robbery conviction. Further, as discussed above, the most powerful evidence of Valtierra's guilt in this case consists of Crosby's statements at trial and just after the

shooting that Valtierra had been wielding a gun during the shooting. This evidence is affected little, if at all, by the underlying-facts inquiry at issue here. Therefore, we hold that the underlying-facts inquiry here did not substantially influence the jury's decision.

We have established that in cases where the cumulative effect of various errors operate to produce a biased jury, errors may require a new trial even though " 'none of [the errors] alone might have been enough to tip the scales.' " *State v. Johnson*, 441 N.W.2d 460, 466 (Minn.1989) (quoting *United States v. Samango*, 607 F.2d 877, 884 (9th Cir.1979)). This is not such a case. Here, all the errors are harmless in the aggregate for the same reasons they are harmless individually. Principally, this is because the errors did not significantly impact the jury's evaluation of Crosby's critical testimony that Valtierra wielded a gun along with Medal–Mendoza and Green when the shootings occurred.

### III.

 Finally, Valtierra argues that even if evidence established that he was armed with a gun and intended to commit robbery, there was not sufficient evidence to show that it was "reasonably foreseeable" to him that murder would be a "probable consequence" of that robbery, as required by the accomplice liability statute. Minn. Stat. § 609.05, subd. 2 (2004). But this court has held that "[w]hether the defendant could reasonably foresee that the victim would be murdered is a question of fact for the jury." *State v. Pierson*, 530 N.W.2d 784, 789 (Minn.1995). And this court has rejected the contention that mur-

---

**6.** The state also argues that the underlying-facts inquiry was permissible because the two crimes were so similar. But evidence introduced for the purpose of showing the similarity of prior crimes is inadmissible outside of a *Spreigl* context. *See* Minn. R. Evid. 404(b) (evidence of other crimes or wrongs is generally not admissible to prove action in conformity therewith).

der may not be a probable consequence of aggravated robbery. *See State v. Atkins,* 543 N.W.2d 642, 647 (Minn.1996) ("Viewing the * * * evidence in the light most favorable to the jury's verdict, the jury had more than sufficient evidence to conclude that [the victim's] murder was a reasonably foreseeable consequence of * * * aggravated robbery * * *."). Therefore we hold that the evidence that Valtierra intended to commit an aggravated drug robbery was sufficient to permit a jury to find that it was reasonably foreseeable to Valtierra that murder would be a probable consequence of that robbery.

Affirmed.

GILDEA, Justice (concurring).

I concur in the majority's conclusion to affirm the conviction. I write separately to express my view on two issues. The first issue relates to the flight instruction. I agree that the district court erred in giving the flight instruction as worded in this case. But in my view our opinion should not be read as prohibiting a properly worded flight instruction in every case. *See State v. McLaughlin,* 250 Minn. 309, 319, 84 N.W.2d 664, 671–72 (1957) ("When the proof is sufficient the trial court may instruct the jury that inference of guilt from the evidence of flight, in connection with other proof, may form the basis from which guilt may be inferred, but this should be qualified by a general statement of the countervailing conditions incidental to a comprehensive view of the question."); *see also United States v. Clark,* 45 F.3d 1247, 1250–51 (8th Cir.1995); *United States v. Roy,* 843 F.2d 305, 310–11 (8th Cir.1988).

The second issue relates to the majority's conclusion that the district court erred in allowing the state to inquire on cross-examination about circumstances of Valtierra's conviction in 2000 for aggravated robbery. I disagree with the conclusion that the district court erred. In my view, the district court did not abuse its discretion in finding that Valtierra "opened the door" to the state's cross-examination as quoted in the majority opinion.

On direct examination, defense counsel established that Valtierra had been convicted of several prior felonies, one of which was an aggravated robbery conviction in 2000. The majority opinion discusses Valtierra's statement that he was "taking full responsibility for what [he] did" in 2000. Also important to my view of this issue is what happened later in the direct examination. Specifically, when discussing the night of the murder, defense counsel asked Valtierra: "But you agree, though, that you put yourself in that situation so you had to accept—is that right?" Valtierra responded:

I guess when I look back at everything that happened, I am still in disbelief. I still can't believe that I am on the stand or I am even in a trial for a murder case, you know. I know I would never, never murder nobody. *I know I would never shoot nobody. I know I love life. I know if [the murder victims] were here, they would tell you guys that I didn't have no gun. I know they would.*

(Emphasis added.) At the conclusion of the direct testimony, defense counsel moved to preclude the prosecution from inquiring further into the facts of the prior aggravated robbery conviction. The district court denied the motion concluding that Valtierra had opened the door to the state asking questions regarding the 2000 offense. On this record, I would not conclude that the district court abused its broad discretion in allowing the limited cross-examination.