**STATE of Minnesota, Respondent,**

**v.**

**James Michael GREEN, Appellant.**

**No. A05–336.**

Supreme Court of Minnesota.

Aug. 10, 2006.

Mike Hatch, Minnesota Attorney General, Susan Gaertner, Jeanne L. Schleh, Assistant Ramsey County Attorneys, Saint Paul, MN, for Respondent.

Suzanne M. Senecal–Hill, Assistant State Public Defender, Minneapolis, MN, for Appellant.

## OPINION

HANSON, Justice.

Appellant James Green appeals from his first and second-degree murder and attempted murder convictions arising out of the shooting of three people during the course of a robbery. Green argues that the district court's submission of two pattern jury instructions—CRIMJIG 4.01 (accomplice liability) and CRIMJIG 4.04 (flight raising a permissive inference of guilt)—denied him a fair trial. Green raises several other pro se arguments. We affirm.

*Relationships and Roles of the Participants*

On January 11, 2004, Green was spending the day with his friend, Daniel Valtierra, who was visiting from Seattle, Washington. While they were sleeping early in the morning of the 12th, an acquaintance of Green's, Michael Medal–Mendoza, called Green asking to buy an ounce of methamphetamine and some ecstasy for a group of unknown women who were from out of town. Green was acquainted with Medal–Mendoza through several prior drug deals. Valtierra and Medal–Mendoza did not know each other.

Green had the ecstasy but not enough methamphetamine to fill the order so he decided to connect Medal–Mendoza with another drug dealer to make some money for himself. Green called Wayne Costilla and asked if he had an ounce of methamphetamine to sell. Costilla did not have that amount, but he was with friends, Andria Crosby and Ron Glasgow, who did. Glasgow agreed to sell the methamphetamine to Costilla, who would sell it to Green, who would sell it to Medal–Mendoza, who would sell it to the out-of-town women.

*The Drug Deal*

Green and Costilla remained as the contact persons for the two groups and arranged to meet at a gas station in Saint Paul to complete the transaction. Crosby, Glasgow, and Costilla drove to the gas station and waited for a few minutes. Green called them back and told them that he, Valtierra, and Medal–Mendoza were delayed at a Perkins restaurant. Costilla changed the plan and told Green to meet them at Costilla's house in Saint Paul.

Crosby, Glasgow, and Costilla arrived at Costilla's house between 3:00 and 3:30 a.m. After about twenty minutes, Green arrived at Costilla's house and went inside alone. Valtierra and Medal–Mendoza stayed in the car. Glasgow gave Green a sample of the methamphetamine and he brought it out to Medal–Mendoza. Medal–Mendoza confirmed its quality. Costilla came outside shortly thereafter and invited all three in.

While inside, Medal–Mendoza began talking on the phone to the out-of-town women and Valtierra sat on the couch next to Glasgow. Green testified that he overheard Medal–Mendoza's conversation and realized that the out-of-town women were hesitant about the price and seemed to have found another source. Medal–Mendoza ended the conversation by telling the women that he would get them a lower price.

Green testified that he, Medal–Mendoza, and Valtierra went back out to the car and Medal–Mendoza called the women back. The women cancelled their order and Medal–Mendoza became upset. Green testified that Medal–Mendoza said he was going to buy the drugs anyway and asked Green if he would request that Glasgow either drop the price or loan him the drugs. Green acknowledged that it would be "very rare" for a drug seller to loan a stranger such a large quantity of drugs.

*The Shooting*

In the trial testimony, there were three versions of how the shooting took place. Crosby testified that after about thirty minutes Medal–Mendoza, Valtierra, and Green kicked open the door and "rushed through the doors like Charlie's Angels with their guns flying." She said she saw a gun in each person's hand and specifically identified Green as having a black gun. She said Medal–Mendoza was the leader and that Green and Valtierra stood behind him. Crosby testified that the following conversation took place while Medal–Mendoza pointed a gun at Glasgow:

Medal–Mendoza: "Motherf* * * * *. I am going to rob you."

Glasgow: "Motherf* * * * *, you are not going to rob me."

Medal–Mendoza: "I will shoot you."

Glasgow: "It looks like you are going to have to shoot me then because you sure aren't robbing me."

Crosby testified that Medal–Mendoza then shot Glasgow and Costilla in the head and Crosby in the leg. The three men then fled the house. Crosby testified that after being shot she fell to the floor and pretended that she was dead. A short time later someone came back inside, "nudged" her in the ribs, took her purse, and fled again.

Valtierra testified that he decided to go inside with Green and Medal–Mendoza but went in a few seconds behind them. He said, "[a]s soon as I come in, only thing I remember was, 'shoot me.' It was boom. I just remember Ron getting hit one time in his chest." Valtierra said that Green brushed past him as he fled from the house as soon as the first shot was fired. Valtierra then fled as well. Valtierra also testified that neither he nor Green had a gun and that Medal–Mendoza did not tell them that he was going to rob or kill anyone.

Green testified that after going back inside, Medal–Mendoza started an argument with Glasgow. Glasgow asked Medal–Mendoza if he was crazy for asking him to loan the drugs to him and Medal–Mendoza took offense at that. Green testified that Medal–Mendoza "tried to pull a gun out on him and said, 'I will take your drugs.'" Glasgow said to Medal–Mendoza, "Shoot me. You ain't going to rob me." Green said Glasgow began taunting Medal–Mendoza which prompted Medal–Mendoza to start shooting. Green said he did not see if Medal–Mendoza hit anything because he immediately turned and ran out of the house after the first shot was fired. Green denied having a gun and said that he was holding a cell phone in his hands. Green said Medal–Mendoza took the drugs with him when he fled.

*Police Response/Investigation*

Crosby testified that after the shooters had left, she screamed for help, deadbolted the door, and called 911. When the police arrived at around 4:20 a.m. Crosby could not unlock the door so they kicked it in. An officer asked Crosby who did the shooting and she said "Two Mexicans and one mulatto." Crosby told the police that she thought she recognized one of the suspects and she later identified Green from a picture out of her high school yearbook. Police also retrieved the surveillance tape from Perkins and observed Green, Valtierra, and Medal–Mendoza leaving about the same time that Crosby said the suspects reported that they were delayed at the restaurant.

Police determined that a total of six shots were fired in the apartment. Each of the three victims was shot twice at close range. Crosby was hit in the leg and in the chest. Glasgow was shot in the head and in the chest and died at the scene. Costilla was shot in the head and in the

neck and died later at the hospital. Police later found $560 in cash in Glasgow's pocket. Police recovered fragments from four of the six bullets that were fired in the apartment, but no bullet casings. Later forensic testing revealed that all four fragments were fired from the same .38 caliber handgun. There was no evidence or suggestion that anyone other than Medal–Mendoza fired any of the shots. The firearm was never recovered.

### Green's Flight

Green and Valtierra testified that after the shooting, they fled on foot to Green's girlfriend's house a few miles away. Green said he got into an argument with Medal–Mendoza over the phone about why he "messed up everything" and said he did not want to talk to Medal–Mendoza. Medal–Mendoza showed up at Green's girlfriend's house a short time later. Green testified that he was not sure how Medal–Mendoza found out where he was.

Valtierra went to the airport that morning, as previously planned, but there was a problem with his ticket and he could not get on the plane. The three then agreed to leave town together that morning with the intent to go to Florida or New York. Green testified that he only went along because he was afraid of Medal–Mendoza, and that he wanted Medal–Mendoza to think that he was not going to turn him in. After driving several hours the three stopped in Milwaukee and stayed in a motel. Green testified that he learned for the first time that people died in the shooting so he called a Saint Paul police officer to turn himself in because he felt he did nothing wrong. Green arranged to meet with the officer and the officer wired him some money so he could get home.

Green and Valtierra also provided testimony suggesting an alternate reason for wanting to go back to Saint Paul. They testified that they became concerned that Medal–Mendoza was going to kill them so they agreed to try to convince him to take them back. Green said that Medal–Mendoza agreed to drive back to Saint Paul after Green told him he needed to pick up some money and drugs that people owed him.

### The Return Trip to Saint Paul

On the drive back, Medal–Mendoza drove at speeds of around 130 miles per hour while under the influence of alcohol and methamphetamine. He caused an accident in Elk Mound, Wisconsin, that Green thought was either a suicide attempt or an attempt at killing Green and Valtierra. The three flagged down help from the driver of a pickup, but the driver sensed that something was wrong and waved down a police officer. The officer testified that upon his arrival Green was trying to hide behind the pickup. Green denied hiding from the officer but said he was only bending over because his back hurt. Green also hid his wallet in the pickup and gave the officer his cousin's name and date of birth as his own. Green said he did this because he wanted to turn himself in on his own and not make it look like he was caught.

Green requested medical attention, was treated, and released from the hospital a short time later. Green then called a friend who picked him up and brought him to another friend's house in Saint Paul. Green was arrested there at around 1:00 a.m. after someone at the house tipped off the police. Green testified that his intention was to turn himself in at the prearranged time and location—4:00 a.m. at the Saint Paul Cathedral—but that the police arrested him before he could do so. An officer acknowledged that this was the initial plan but said they decided to arrest him when they received the tip because Green had missed other appointments to turn himself in.

*Jailhouse Admission*

In addition to presenting this evidence at trial, the state presented testimony from Leroy DeMeules, who met Green while they were in jail together. De-Meules testified that Green asked De-Meules if he was in the same cellblock as Medal–Mendoza. DeMeules said he was and Green asked him to relay a message. DeMeules testified:

> He [Green] wanted Michael to take the case, because he hadn't been charged with any felony before. He wanted me to relay that if Michael did take it, that he would be tooken (sic) care of up in prison, if he didn't, he would also be tooken (sic) care of.

DeMeules took this to mean that Medal–Mendoza would be rewarded if he took the blame for the murders or punished if he did not.

DeMeules also testified that Green bragged to him about the murders. He said Green seemed excited about it and told him that his role was to check the woman (Crosby) to make sure she was dead. Green told DeMeules that he kicked her in the ribs and as Green said this he made a motion with his hand like he was holding a pistol.

DeMeules relayed the message to Med-al–Mendoza, who told his attorney. His attorney in turn told the prosecutor who subpoenaed DeMeules to testify. De-Meules did not receive any benefit for testifying against Green. Green denied saying this to DeMeules and speculated that DeMeules fabricated the story after reading Green's police reports, which he kept unsecured in his jail cell.

The jury found Green guilty as charged and he was sentenced to consecutive life terms for aiding and abetting the first-degree intentional felony murder of two victims and a concurrent term of 240 months for aiding and abetting attempted murder of the third victim. Valtierra was tried separately and also convicted. In Valtierra's appeal we rejected his arguments that he was denied a fair trial by the submission of pattern jury instructions on accomplice liability and flight. *State v. Valtierra,* 718 N.W.2d 425, 2006 WL 2075194 at *5–6 (Minn. July 27, 2006). Green's first two arguments are virtually identical to those made in *Valtierra.*

## I.

■ Green first argues that the district court erred in giving an unmodified version of the pattern jury instruction on accomplice liability for crimes of another. Minn.Stat. § 609.05, subd. 2 (2004); 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guidelines, Criminal,* CRIMJIG 4.01 (4th ed. 1999) (amended in 2006 supplement to read "reasonably foreseeable to the defendant."). He argues that it was error to not add the words "to appellant" after the phrase "the defendant is also guilty of any other crime the person commits while trying to commit the intended crime if that other crime was reasonably foreseeable." The state points out that Green not only failed to object to CRIMJIG 4.01, he specifically requested it. We need not decide whether plain error applies or whether Green's request increased his burden or constituted a waiver because we have already held on several occasions that CRIMJIG 4.01 is not erroneous. *See State v. Earl,* 702 N.W.2d 711, 721 (Minn.2005); *State v. White,* 684 N.W.2d 500, 509 (Minn.2004); *State v. Peirce,* 364 N.W.2d 801, 809–10 (Minn. 1985). We confirmed these holdings in *Valtierra.*

Green argues that because in *Earl* we suggested that all future jury instructions include the entire statutory phrase "reasonably foreseeable to the person," this

court was implying that there may be other cases that would lead us to conclude that the instruction is erroneous. Green argues that his is that type of case because the language from the instruction was repeated to the jury three times. Green emphasizes the centrality of the instruction to his conviction and the heightened importance of correctly responding to the jury's question during deliberations.

In *Earl* we suggested a modification of CRIMJIG 4.01 "[t]o avoid the necessity of dealing with this issue in the future." 702 N.W.2d at 722. In *Valtierra*, we concluded that

"*Earl's* suggestion to use the entire statutory phrase does not apply to this case since Valtierra's trial was conducted before our decision in *Earl*, and was not, therefore, a 'future instruction[ ] on accomplice liability.' The result here is identical to the result in *Earl*, which held that giving the standard instruction was not error."

718 N.W.2d at 434, 2006 WL 2075194, at *6 (emphasis in original) (citations omitted). We continue to adhere to the position taken in *Valtierra* and *Earl*.

## II.

■ Green also argues that the district court erred in submitting the permissive-inference instruction on flight, CRIMJIG 4.04. Over Green's objection, the district court instructed the jury:

[I]t is for you alone to decide whether or not the defendant fled after the alleged crimes. If you determine that he did flee, then you may take such flight into consideration as an inference of guilty intention at the time of the incident giving rise to these charges. Flight, in itself, is not conclusive evidence of a guilty intent; but if you find that such flight existed, then you may consider it, along with all of the other pertinent

evidence in this case, in determining whether or not the State has established that the defendant possessed the requisite intent at the time and place of the alleged crimes.

Although we approved of this instruction in *State v. McLaughlin*, 250 Minn. 309, 319, 84 N.W.2d 664, 671–72 (1957), in *Valtierra* we concluded:

Flight instructions are a species of permissive-inference instruction, and the factors leading us to reject such instructions in [*State v.*] *Litzau*[, 650 N.W.2d 177 (Minn.2002)] and [State v.] *Olson*[, 482 N.W.2d 212 (Minn.1992)] apply with full force to flight instructions. *Cf. Litzau*, 650 N.W.2d at 186 & n. 7, 187; *Olson*, 482 N.W.2d at 215–16. *See also State v. Oates*, 611 N.W.2d 580, 584 (Minn.App.2000) ("There is no need to instruct the jury that a [suspect] fleeing the scene is displaying a 'consciousness of guilt.' "). Therefore, we hold that the district court erred by instructing the jury on the permissive inference that may be drawn from evidence of flight.

718 N.W.2d at 433, 2006 WL 2075194, at *5.

■ Thus, the only issue is whether the error in giving the permissive inference instruction was harmless. In *Valtierra* we held the error in giving the instruction was harmless because, unlike *Olson*, the flight was only peripheral to the state's case, which was otherwise supported by Crosby's testimony that Valtierra had a gun and by Crosby's prior consistent statement to that effect. 718 N.W.2d at 433, 2006 WL 2075194, at *6. The state's case against Green was even stronger. Green organized the drug deal and was the common link between the suspects and the victims. After the shooting the three met at Green's girlfriend's house—where Green said he lived—to discuss their getaway plans. Finally, there is evidence from

the jailhouse informer that Green admitted that, after the shooting, he returned to the scene and nudged Crosby to make sure she was dead.

In *Valtierra* we noted that any potential harm that could have resulted from the jury unduly focusing on his flight was mitigated by the fact that Valtierra reversed his flight and returned home. *Id.* The potential harm caused by the instruction in Green's trial was even further mitigated because a police officer testified that Green, on his own accord, contacted the police and made arrangements to turn himself in, and that Green was arrested in Saint Paul shortly before the prearranged meeting time.

Finally, we note that, as in *Valtierra*, the error in giving the flight instruction is that it is argumentative, not that it inaccurately conveys the law or improperly suggests that the jury was compelled to make the inference. For these reasons we conclude that the erroneous jury instruction was harmless.

### III.

By pro se supplemental brief, Green asserts reversible error in the denial of a *Batson* challenge, nonsequestration of the jury during deliberations, and juror misconduct. He also challenges the sufficiency of the evidence and the credibility of a witness. Finally, he argues he was denied effective assistance of counsel.

#### Batson Violation

■ Green requests "a *Batson* challenge because there was racial profiling committed by the prosecutors" and the judge. Green does not provide any specifics. We interpret Green's argument to focus on the state's use of a peremptory challenge to remove the only black veniremember. In *Purkett v. Elem*, the Supreme Court summarized the *Batson* analysis as follows:

[O]nce the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful discrimination.

514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (citations omitted). "[T]he mere fact that the veniremember subject to the strike is a racial minority does not establish a prima facie case of discrimination." *Angus v. State*, 695 N.W.2d 109, 117 (Minn.2005). The burden is on the moving party to identify circumstances raising an inference that the exclusion was based on race. *Id.* Although Green made a timely objection to the preemptory challenge, he failed to identify any circumstances raising an inference that the exclusion was based on race and he has also failed to identify such circumstances on appeal.

#### Jury Nonsequestration

■ Green argues that he is entitled to a new trial because the district court allowed the jurors to go home during deliberations. He argues his case was highly publicized and the jurors could have been swayed by their friends and family or by the media.

The record reflects that on a Friday evening, when it became apparent that the jury would need more time to deliberate, the district court asked a bailiff to secure hotel accommodations in anticipation of sequestration. Extensive efforts were made to find rooms throughout the entire metropolitan area, but nothing was available. Both the state and the defense said they preferred sequestration but neither could

propose a means of accomplishing it. Before allowing the jurors to go home the court instructed them not to discuss the case with anyone and not to read newspapers, watch television, or listen to the radio. They returned the following morning and reached a verdict that day.

In *State v. Anderson* we said:

[M]ere separation of the jury in violation of Minn. R.Crim. P. 26.03, subd. 5, without more, does not raise a presumption of prejudice. *State v. Sanders*, 376 N.W.2d 196 (Minn.1985). Prejudice in such a case will be presumed only upon a showing of any private communication or contact or any other circumstance suggestive of improper influence or jury tampering, direct or indirect.

379 N.W.2d 70, 81 (Minn.1985). Green fails to identify any evidence of private communication or improper influence of the jury. Absent this evidence, and considering the district court's exhaustive efforts to sequester the jury, we hold the court did not err in allowing the jury to return home overnight.

### Juror Misconduct

■ Green mentions the possibility that one of the jurors could have been intoxicated during deliberations but does not explain how this affected the verdict. On the morning that the jury reached their verdict, the judge did disclose that the foreperson had conveyed to the bailiff that one of the jurors "thought she smelled alcohol" on another juror. Green requested a *Schwartz* hearing based on this information but the district court denied this request.

■ A juror's consumption of alcohol is not a ground for a new trial unless it is shown that the juror was thereby incapacitated or rendered unfit to discharge his duties intelligently. *State v. King*, 88 Minn. 175, 185, 92 N.W. 965, 969 (1903).

The decision to grant or deny a *Schwartz* hearing to make this determination is within the discretion of the district court. *Id.*; *State v. Durfee*, 322 N.W.2d 778, 786 (Minn.1982).

The district court noted that the juror who reported the incident was not concerned about the juror being under the influence but just thought that the juror had something to drink the night before. The judge noted that she made several personal observations of the juror in question, including her ability to walk a long distance, and had no reason to believe that she was impaired. Under these facts we conclude the district court did not abuse its discretion.

### Sufficiency of the Evidence of Underlying Felony: Robbery

■ Green argues that there was insufficient evidence to prove that a robbery occurred because one of the victims had $500 in his pocket when police arrived. But the evidence must be taken in the light most favorable to the verdict. *State v. Moore*, 438 N.W.2d 101, 108 (Minn. 1989). And there was evidence that drugs were stolen from the scene and that Medal–Mendoza announced, "I am going to rob you." This constitutes sufficient evidence that at least an attempted aggravated robbery had been committed, and this is sufficient to be guilty of first-degree intentional felony murder.

### Witness Credibility

■ Green argues that he is entitled to a new trial because Crosby lied in her testimony and that she was not credible because at the time of the incident she was under extreme stress and impaired by drugs and alcohol. This argument has no merit because it is within the jury's exclusive province to assess the credibility of a

witness. *State v. Folkers,* 581 N.W.2d 321, 327 (Minn.1998).

*Ineffective Assistance of Counsel*

 Finally, Green argues that he was denied effective assistance of counsel because his lawyer was afraid of the judge, did not address matters that Green asked him to address, did not adequately prepare Green for testifying, did not properly research and investigate the case, and did not properly develop Green as a human in the eyes of the jury. Because these allegations cannot be reviewed on the basis of the trial record, we decline to address them here. They are more properly raised in a petition for post conviction relief. *See Robinson v. State,* 567 N.W.2d 491, 495 (Minn.1997).

Affirmed.