STATE OF MINNESOTA

IN SUPREME COURT

A25-0102

Ramsey County                                                                              Gaïtas, J.

James Michael Green,

      Appellant,

vs.                                                                              Filed: May 13, 2026
                                                                              Office of Appellate Courts
State of Minnesota,

      Respondent.

_____

Scott M. Flaherty, Taft Stettinius & Hollister LLP, Minneapolis, Minnesota; and

Nico Ratkowski, Ratkowski Law PLLC, Saint Paul, Minnesota, for appellant.

Keith Ellison, Attorney General, Saint Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Michelle Ann Monteiro, Assistant Ramsey County Attorney, Saint Paul, Minnesota, for respondent.

_____

S Y L L A B U S

1.     We review an appeal from a district court's denial of a petition to vacate under the Act of May 19, 2023, ch. 52, art. 4, § 24, 2023 Minn. Laws 810, 864–68 (the Act), for an abuse of discretion.

1

2. The district court did not abuse its discretion in denying the appellant's petition to vacate his first-degree felony murder convictions under an aiding-and-abetting theory of liability.

3. Upon holding an evidentiary hearing under the Act, a district court does not err by weighing the evidence presented by the parties to reach its determination.

4. Following an evidentiary hearing, a district court reviewing a petition to vacate under the Act is not required to resolve any uncertainties in favor of the petitioner.

Affirmed.

O P I N I O N

GAÏTAS, Justice.

Appellant James Green appeals from the district court's denial of relief under the Act of May 19, 2023, ch. 52, art. 4, § 24, 2023 Minn. Laws 810, 864–68 (the Act), a session law that established a pathway to challenge certain convictions for felony murder that were based upon an aiding-and-abetting theory of liability. In 2004, a jury found Green guilty of two counts of first-degree felony murder and one count of attempted first-degree felony murder, each under an aiding-and-abetting theory of criminal liability. We affirmed his convictions on direct appeal. *State v. Green*, 719 N.W.2d 664 (Minn. 2006). Twenty years after his trial, in 2024, Green sought to vacate his first-degree felony murder convictions under the Act. After reviewing Green's preliminary application, the district court allowed him to file a petition to vacate his convictions and scheduled an evidentiary hearing. At the evidentiary hearing, Green's attorney told the district court that Green would not offer any live witness testimony, and that the district court should

decide the case based on trial transcripts and other documentary records. After weighing the evidence presented at the evidentiary hearing, the district court denied Green's petition to vacate. The district court determined that Green failed to prove, by a preponderance of the evidence, that he did not act with the intent to kill the three victims of the shooting. Because the district court did not err in making that determination, we affirm.

## FACTS

On January 12, 2004, a shooting at a home in Saint Paul killed two people and seriously injured a third person, A.C. Law enforcement arrested appellant James Green and two other men for the shooting. A grand jury indicted Green for six offenses: two counts of first-degree felony murder (aggravated robbery), Minn. Stat. § 609.185(a)(3), one count of attempted first-degree felony murder (aggravated robbery), Minn. Stat. §§ 609.185(a)(3), 609.17, two counts of second-degree intentional murder, Minn. Stat. § 609.19, subd. 1(1), and one count of attempted second-degree intentional murder, Minn. Stat. §§ 609.19, subd. 1(1), 609.17. The indictment alleged aiding-and-abetting theories of criminal liability for each count. Green pleaded not guilty. The case then proceeded to a two-week jury trial.

### *The State's trial evidence*

The State called more than a dozen witnesses, including Saint Paul police officers and medics who responded to the shooting, police investigators, and medical examiners. A.C., who was injured in and witnessed the shootings, also testified.

3

According to A.C., she used methamphetamine with her boyfriend, Ronald Glasgow, and her friend, Wayne Costilla, during the early morning of January 12, 2004. While this group was together, Costilla received a call from "his friend" who wanted to buy methamphetamine for "these girls from out of town." A.C. and Glasgow agreed to sell the drugs to Costilla, and Costilla planned to then sell the drugs to his friend. They met Costilla's friend—who A.C. later identified as Green—at Costilla's home in Saint Paul. Two other men, Michael Medal-Mendoza and Daniel Valtierra, accompanied Green. Costilla invited the men to come inside the home. They discussed the drug sale, and Medal-Mendoza made a phone call. After about 20 minutes, Green, Medal-Mendoza, and Valtierra left the house. A.C. believed they were going to meet "the girls" at a nearby gas station to give them a drug sample and get money for the full purchase.

A.C. testified that, after about thirty minutes, the three men returned to Costilla's home and "rushed through the doors like Charlie's Angels with their guns flying." According to A.C., each of the three men had a gun. She testified that Medal-Mendoza had a silver gun, while the other two men had darker-colored guns. A.C. told the jury that Medal-Mendoza was "in the lead" in front of the other two men and that he stood about one to two feet from where she was sitting on a couch. Green stood next to Medal-Mendoza.

A.C. testified that Medal-Mendoza pointed his gun at Glasgow and said, "Mother****er. I am going to rob you," to which Glasgow responded, "Mother****er, you are not robbing me." According to A.C., Medal-Mendoza then threatened to shoot Glasgow. Glasgow said, "It looks like you are going to have to shoot me then because

4

you sure aren't robbing me." After that exchange, A.C. testified, Medal-Mendoza shot Glasgow in the head. A.C. then heard multiple additional gunshots. She testified that she felt a bullet hit her thigh and then she moved to the floor. A.C. told the jury that she did not hear any of the three assailants say anything or express surprise at the shooting. She further testified that when the shooting stopped, the three assailants ran out the door. A.C. saw that Costilla was also shot and was hanging over the side of the couch.

After a couple of minutes, one of the assailants returned to the house. A.C. testified that she "play[ed] dead." The assailant nudged her, took her purse, and then left. A.C. testified that she saw the person's arm "for a quick second" and the person was "dark skinned." According to A.C., "it wasn't like light, tan. It was the darker skinned because the guys were pretty white."

A.C. called 911 and was taken to the hospital, where she was treated for gunshot wounds to her calf, thigh, and chest. Glasgow and Costilla both died from their injuries. Medical examiners testified that Glasgow's cause of death was gunshot wounds to the head and chest, and Costilla's cause of death was a gunshot wound to the head.

While A.C. was in the hospital, she told police that Green resembled a high school classmate. She later identified Green from a picture in her high school yearbook. Investigators testified that A.C.'s story about the events remained consistent, including that she was certain all three men had guns.

Two days after the shooting, Green was arrested in Saint Paul. Shortly after his arrest, investigators interviewed Green. After waiving his *Miranda* rights, Green admitted to setting up the drug sale. He also admitted that he had been in the house when Medal-

5

Mendoza shot Glasgow. Green denied returning to the house to take A.C.'s purse. He told police that he believed Medal-Mendoza took A.C.'s purse because Medal-Mendoza later showed him A.C.'s identification. Green also told police that he drove to Chicago with Medal-Mendoza and Valtierra following the shooting. After staying in Chicago for one night, the three men turned around and were driving back to Minnesota when they got into a car accident in Wisconsin. A Wisconsin police officer testified that, after the car accident, Green gave a false name and said he was on his way back to Minneapolis or Saint Paul to see his son.

The jury also heard from an inmate who briefly spoke with Green in the medical department of the jail after Green's arrest. The inmate testified that, while in the waiting room, Green learned that the inmate was housed in the same jail unit as Medal-Mendoza. Green asked him to relay a message to Michael Medal-Mendoza. That message was "if Michael did take it, that he would be tooken [sic] care of up in prison, if he didn't, he would also be tooken [sic] care of." The inmate testified that Green was "gloating" about the shootings. According to the inmate, Green described how "his part in it was to check the woman to make sure the woman was dead." The inmate also testified that Green said that he "kicked her underneath the ribs" while motioning his hand "down like it was a pistol in his hand." On cross-examination, the inmate acknowledged that he was housed in the same "pod" as Medal-Mendoza and that Medal-Mendoza had a copy of his criminal complaint. But the inmate denied seeing Medal-Mendoza's complaint.

***Green's trial evidence***

Green testified in his own defense and offered a different version of events. According to Green, he was with his childhood friend—Valtierra—on the night of the incident. Medal-Mendoza called him, asking if he had any methamphetamine to sell to some "girls" from out of town. Because Green did not have methamphetamine, he arranged for a sale between him, Medal-Mendoza, and the three victims. While in Costilla's Saint Paul home, Green overheard Medal-Mendoza's phone conversation with "the girls" and learned that they were backing out of the sale. Medal-Mendoza, however, told the group that he was going to meet "the girls" at a nearby gas station to complete the sale, and he went outside with Green and Valtierra. According to Green, Medal-Mendoza then called "the girls" again, trying to convince them to buy the drugs. Medal-Mendoza began getting "very hot and mad on the phone," telling "the girls," "I lined up these drugs for nothing now. You are standing me up." Green testified that after "the girls" backed out, Medal-Mendoza still wanted to buy the drugs. He asked if Green would negotiate with Costilla for a lower price or to purchase the drugs on credit, which Green refused to do.

Green told the jury that the group went back into the house, where Medal-Mendoza started to argue with Glasgow before pulling out his gun. According to Green, he did not know that Medal-Mendoza had a gun. Green also denied having his own gun, testifying that he only had his cell phone in his hand. He testified that Valtierra did not have a gun either. Green testified that when he saw Medal-Mendoza pull out a gun, he

7

"stopped, shocked, was froze [sic]," and then immediately ran out of the house when the first shot was fired.

Green explained that he went to Chicago with Medal-Mendoza after the incident because he was scared that Medal-Mendoza would kill him. He believed that he had to convince Medal-Mendoza that he would not report him. Green testified that, once he found out that people had died in the shooting, he called the police and made arrangements to turn himself in. He convinced Medal-Mendoza to return to Saint Paul by lying to him. Green testified that he told Medal-Mendoza that he needed to collect money and drugs that other people owed, but they could leave town after that. While driving back to Minnesota, however, Medal-Mendoza was "drunk and still high on meth," and he began speeding. According to Green, Medal-Mendoza crashed into a semi-truck in what may have been either a suicide attempt or an attempt to kill Green and Valtierra. Green testified that, after the crash, he gave the Wisconsin police a false name because he wanted to make it back to Saint Paul so that he could turn himself in to people who knew him and the case.

Valtierra also testified on behalf of the defense. He corroborated Green's story. According to Valtierra, while they were outside of the house, Medal-Mendoza proposed going back inside to see if they could talk down the price of the drugs. He also testified that neither he nor Green had a gun, and that Green ran from the house as soon as the first shot was fired.

8

### *Closing arguments and verdicts*

During closing arguments, the prosecutor did not dispute that Medal-Mendoza was the only shooter and that Green never fired a weapon. But the prosecutor emphasized that, although Green did not shoot anyone, Green could still be found guilty because he had been an active participant in the robbery. The prosecutor told the jury that, under the aiding-and-abetting theory of liability, if Green intentionally aided another person in committing a crime, he was "also guilty of any other crime that person commits while trying to commit the intended crime." Analogizing to a getaway driver in a bank robbery, the prosecutor argued that "[t]he driver is as guilty as the person that pulled the trigger." But Green's attorney told the jury that Green did not know there would be a robbery: "Mr. Green and Valtierra thought they were going to a drug deal and they ended up at a murder: You can't aid and abet something you don't know … is going to happen."

The jury found Green guilty on all six counts. At sentencing, the district court sentenced Green to two consecutive life sentences for the two first-degree felony murder counts and to a concurrent 240-month sentence for the first-degree attempted felony murder count.

### *Green's direct appeal*

Green directly appealed to this court. *State v. Green*, 719 N.W.2d 664 (Minn. 2006). In his appeal, Green challenged two of the jury instructions given at his trial: the

9

instruction on accomplice liability for crimes of another[1] and a permissive inference instruction regarding Green's flight.[2] *Green*, 719 N.W.2d at 667. Green also alleged several errors in a pro se supplemental brief and argued that he was entitled to a new trial because A.C. lied in her testimony. *Id.* at 672–73. We affirmed Green's convictions. We held that the district court did not err in giving the accomplice liability jury instruction and that the jury instruction regarding Green's flight was harmless error. *Id.* at 671–72. We also rejected Green's arguments in his pro se supplemental brief and stated that Green's attack of A.C.'s credibility had "no merit because it is within the jury's exclusive

---

[1]     The jury instructions, under the heading "Liability for the Crimes of Another," read in relevant part:

> The defendant is guilty of a crime committed by another person when the defendant has intentionally aided the other person in committing it, or has intentionally advised, hired, counseled, conspired with, or otherwise procured the other person to commit it.

> If the defendant intentionally aided another person in committing a crime, or intentionally advised, hired, counseled, conspired with, or otherwise procured the other person to commit it, the defendant is also guilty of any other crime the other person commits while trying to commit the intended crime, if that other crime was reasonably foreseeable as a probable consequence of trying to commit the intended crime.

[2]     The permissive-inference instruction on flight given to the jury read as follows:

> [I]t is for you alone to decide whether or not the defendant fled after the alleged crimes. If you determine that he did flee, then you may take such flight into consideration as an inference of guilty intention at the time of the incident giving rise to these charges. Flight, in itself, is not conclusive evidence of a guilty intent; but if you find that such flight existed, then you may consider it, along with all of the other pertinent evidence in this case, in determining whether or not the State has established that the defendant possessed the requisite intent at the time and place of the alleged crimes.

10

province to assess the credibility of a witness." *Id.* at 672–74. Following the direct appeal, Green also filed several pro se postconviction petitions, which the district court denied.

### Green's petition to vacate under the Act

In 2023, the Legislature amended Minnesota's statute governing aiding and abetting liability and expansive liability. Act of May 19, 2023, ch. 52, art. 4, § 3, 2023 Minn. Laws 810, 850 (codified at Minn. Stat. § 609.05, subd. 2a). Before the amendment, a defendant could be convicted of first-degree felony murder under an aiding-and-abetting theory of liability without the intent to cause the death of another person. *See* Minn. Stat. § 609.05, subds. 1–2 (2021). Now, under the amended statute, a defendant cannot be convicted of first-degree felony murder under an aiding-and-abetting theory unless the State proves that the defendant "intentionally aided, advised, hired, counseled, or conspired with or otherwise procured the other with the intent to cause the death of a human being." Minn. Stat. § 609.05, subd. 2a(a) (2025).

Alongside that amendment, the Legislature also enacted the Act, which allows individuals convicted of aiding and abetting first-degree felony murder under the earlier law to challenge their convictions. The Act created a two-step process for individuals to petition to have their convictions vacated. The Act, subd. 1. First, the individual must file a preliminary application with the district court, which the district court reviews to determine if "there is a reasonable probability that the application is entitled to relief." [3]

---

[3]    A district court may also summarily deny an application under the four enumerated grounds in subdivision 5(e): the application does not include the required

11

*Id.*, subd. 5(c). Second, if the district court determines that there is a reasonable probability that the application is entitled to relief, the applicant may then file a petition to vacate the conviction. Upon receiving a petition to vacate, the district court may grant the petition without an evidentiary hearing, deny the petition without an evidentiary hearing, or proceed to an evidentiary hearing. *Id.*, subd. 6(e). Following an evidentiary hearing, a petitioner is entitled to relief if the petitioner shows by a preponderance of the evidence that the petitioner: (1) did not cause the death of a human being and (2) did not intentionally aid, advise, hire, counsel, or conspire with or otherwise procure another with the intent to cause the death of a human being. *Id.*, subd. 7(a).

Following this process, Green filed his preliminary application in February 2024. The district court granted Green's preliminary application. In April 2024, Green timely filed a petition to vacate his first-degree felony murder convictions. After the State responded to Green's petition, the district court denied the petition on June 5, 2024, finding that there was no reasonable probability that Green was entitled to relief. But the district court then stayed its order denying relief since the time for Green to file a reply brief had not yet expired. *See* the Act, subd. 6(e)(2) (giving the district court authority to deny the petition after the reply if "additional information or submissions establish that there is not a reasonable probability that the applicant is entitled to relief"). After Green

information, the applicant is not in the custody of the commissioner of corrections or under court supervision, the applicant was not convicted of certain crimes, or the issues raised are not relevant to the relief available or have been previously decided.

submitted his reply brief, the district court vacated its original order and scheduled an evidentiary hearing.

At the evidentiary hearing, Green's attorney told the district court that Green would not offer any live witness testimony. Instead, the attorney stated that Green was "relying on the testimony from prior cases and on other documentary records that were more contemporaneously recorded." The district court confirmed with Green that he did not intend to testify, and it further confirmed that Green understood his right to testify as well as the "pros and cons" of his decision. The attorney then submitted 41 exhibits in support of Green's petition. These exhibits included police reports, transcripts of Green's jury trial, transcripts of Medal-Mendoza's and Valtierra's jury trials, transcripts of Green and Valtierra's interviews after their arrest, and the transcript of a 2024 interview with A.C. The State did not submit any exhibits.

In December 2024, the district court denied Green's petition to vacate his convictions. It concluded that Green did not meet his burden of proving, by a preponderance of the evidence, that he did not intentionally aid another with the intent to cause the deaths of the three victims.

The district court cited three reasons for its decision. First, the district court reasoned that the jury at Green's trial had concluded that A.C.'s account of the incident was more credible than Green's and Valtierra's trial testimony, something this court had affirmed. The district court found Green's assertions that he did not have a gun and was unaware that Medal-Mendoza had a gun until the shooting to be "self[]serving." Second, the district court stated that, by finding Green guilty of the lesser-included offenses of

13

second-degree intentional murder and attempted second-degree murder, the jury had already concluded that Green acted with the intent to kill. Third, the district court concluded that the facts of the case "establish that [Green] intentionally aided Medal-Mendoza with the intent to cause the deaths of all three victims." According to the district court, those facts included the following: A.C.'s testimony that all three men rushed through the doors with guns and that Green, specifically, held a black gun; Green's failure to restrain or prevent Medal-Mendoza from carrying out his threat to the victims; Green's failure to render aid to the victims; Green's return to the scene to ensure that A.C. was dead and to steal her purse; Green's flight to another state after the crime and use of a false name; and Green's threat to Medal-Mendoza that he would be "taken care of" if Medal-Mendoza did not take the blame for the crimes.

Green appeals the district court's denial of his petition for relief under the Act.

**ANALYSIS**

Before addressing Green's arguments, we identify the applicable standard of review. In *State v. Griffin* (*Griffin IV*), 20 N.W.3d 57, 60–62 (Minn. 2025), we treated a district court's denial of relief under the Act as an appealable denial of postconviction relief. A district court's denial of postconviction relief is reviewed for an abuse of discretion. *Fox v. State,* 938 N.W.2d 252, 256 (Minn. 2020). Accordingly, in *State v. Griffin* (*Griffin V*), 24 N.W.3d 247, 254 (Minn. 2025), we concluded that appellate courts should review a district court's denial of a preliminary application under the abuse of discretion standard. Under that standard, a postconviction court abuses its discretion when it has "exercised its discretion in an arbitrary or capricious manner, based its ruling

14

on an erroneous view of the law, or made clearly erroneous factual findings." *Rhodes v. State*, 875 N.W.2d 779, 786 (Minn. 2016) (citation omitted) (internal quotation marks omitted).

Green's case, however, involves a different stage of the proceedings under the Act. Unlike *Griffin*, which involved the denial of a preliminary application for relief, the district court here allowed Green to file a petition for relief, granted an evidentiary hearing, and denied relief following the evidentiary hearing.

Although Green's case involves a different stage of the proceedings under the Act, we conclude that the abuse of discretion standard likewise applies to the district court's denial of relief following an evidentiary hearing. In *Griffin V*, we analogized a district court's denial of relief under the Act as equivalent to an order denying postconviction relief. *Griffin V*, 24 N.W.3d at 254. We observe that the standard of review for a district court's postconviction order is abuse of discretion, regardless of whether the district court denied an evidentiary hearing or denied relief following an evidentiary hearing. *State v. Allwine*, 963 N.W.2d 178, 188 (Minn. 2021) ("We review the district court's denial of postconviction relief, including a denial of relief without an evidentiary hearing, for an abuse of discretion."); *Scruggs v. State*, 484 N.W.2d 21, 25 (Minn. 1992) (reviewing a district court's denial of postconviction relief following an evidentiary hearing for an abuse of discretion). Likewise, we conclude that an appellate court should review a district court's decision denying relief under the Act after an evidentiary hearing for an abuse of discretion.

II.

Green's central argument is that the district court abused its discretion in denying his petition to vacate. He argues that the district court erred in two ways: first, by making various errors in its analysis of the evidence; and second, by deferring to the jury's determinations in the 2004 trial. We consider these arguments in turn.

A.

Green asserts that the district court abused its discretion in how it considered the evidence in denying his petition to vacate. Specifically, he alleges that the district court: (1) made erroneous findings of fact regarding Green's involvement in the shootings, (2) gave too much weight to Green's flight after the shooting, (3) failed to apply the appellate standard of review for evaluating the sufficiency of the circumstantial evidence in reviewing his petition, and (4) did not adequately consider the evidence before it. Each of these arguments is addressed below.

1.

Green argues that at least three of the district court's factual findings are clearly erroneous and "not grounded in the record."

A district court abuses its discretion when its findings of fact are clearly erroneous. *Rhodes*, 875 N.W.2d at 786. Factual findings are clearly erroneous when "there is no reasonable evidence to support the finding or when an appellate court is left with the definite and firm conviction that a mistake occurred." *State v. Rhoads*, 813 N.W.2d 880, 885 (Minn. 2012).

16

First, Green challenges the district court's finding that "[Green] and Valtierra were acting in concert with the shooter … in all aspects of the drug deal, the robbery, the murders, and the attempted murder, before, during, and after the crimes." The district court's finding that Green acted "in concert" with Medal-Mendoza is supported by uncontested facts in the record—including that Green helped set up the drug deal, was the point person for communications with Costilla, was present when the shooting occurred, and fled the scene and the state with Medal-Mendoza after Medal-Mendoza shot the three victims.

Second, Green argues that the district court clearly erred in relying on evidence that Green had a gun to determine that Green had intent to kill. Green points to his own testimony and out-of-court statements that he did not possess a firearm and had no intent to cause death. Here, too, the district court did not clearly err when it found that Green had a gun because the record supports this finding. After the shooting, A.C. consistently testified that Green was pointing a black gun when the shooting occurred. The State also presented the testimony of the inmate in the jail's medical department that, when Green later recounted the events to him, Green moved his hand "down like it was a pistol in his hand."

Third, Green contends that the district court clearly erred in finding that Green returned to the scene and "nudged" the surviving victim to make sure she was dead and to steal her purse. The district court, however, reasonably concluded from the trial evidence that Green was the individual who returned to the scene and "nudged" A.C. Green argued to the district court that A.C.'s trial testimony, which indicated that the individual who

17

returned was "dark skinned," established that this individual was not Green. But the district court reasonably could have relied on other evidence to reach its conclusion. Specifically, the inmate from the medical department testified that Green admitted that his role in the shooting was to "check the woman to make sure the woman was dead."

Finally, to the extent that Green challenges the district court's overall conclusion—based on its underlying findings of fact—that Green did not meet his burden of proof, the record supports that conclusion. As the State observes, the only exculpatory evidence that Green produced to meet his burden was his own trial testimony and testimony that Valtierra gave at both Green's trial and his own trial. On the other hand, evidence in the record shows that Green was at the scene of the crime with a gun, did not attempt to constrain Medal-Mendoza or prevent him from carrying out his threat to shoot Glasgow, did not provide aid to the victims after the shooting, and fled the scene of the crime with Medal-Mendoza. *See State v. Swanson*, 707 N.W.2d 645, 659 (Minn. 2006) (holding that intent to aid in the commission of a crime can be inferred from factors such as "defendant's presence at the scene of the crime, defendant's close association with the principal before and after the crime, defendant's lack of objection or surprise under the circumstances, and defendant's flight from the scene of the crime with the principal"). As noted, the record also includes testimony that Green admitted that his role in the shooting was to "check the woman to make sure the woman was dead," which indicates that he coordinated with the principal to kill the victims. These facts collectively support the district court's conclusion that Green did not meet his burden of proof.

18

Because the record supports the challenged factual findings, they are not clearly erroneous. And because the district court's factual findings support its ultimate conclusion that Green failed to meet his burden of proof, we discern no abuse of discretion.

2.

Next, Green argues that the district court erred in how it considered Green's flight after the shooting. Green notes that in his 2006 direct appeal, we determined that the district court's jury instruction regarding evidence of flight was erroneous, but we ultimately concluded that the error was harmless because the evidence of Green's flight was "peripheral" to the State's case. Here, however, Green asserts that the district court wrongly elevated the evidence of his flight from Minnesota after the shooting "from near irrelevance to a central factor demonstrating Green's supposed intent to cause death."

In Green's direct appeal, we were troubled by the flight jury instruction because it was argumentative, not because it inaccurately represented the law. *Green*, 719 N.W.2d at 672. Whether an instruction about flight is too argumentative to present to a jury is a separate issue from whether a court may consider flight in evaluating a defendant's intent during postconviction-type proceedings or on appeal. Indeed, we have acknowledged that a defendant's flight from the scene of the crime with the principal may be considered in analyzing the defendant's intent. *See Swanson*, 707 N.W.2d at 659.

Here, the district court evaluated Green's flight as part of its analysis of Green's intent to kill. It noted that Green fled the scene of the crime with Medal-Mendoza, that he "fled St. Paul with his accomplices within hours of the crimes and left the State of

19

Minnesota," and that he "fled a third time, when stopped by police after the car accident in Wisconsin and he evaded police." We disagree with Green, however, that his flight was the "central factor" in the district court's analysis. And we conclude that the district court did not improperly rely on Green's flight as a factor in determining that Green had an intent to kill.

3.

Third, Green contends that the district court abused its discretion when it failed to apply the appellate standard of review for evaluating the sufficiency of circumstantial evidence in deciding whether to grant his petition to vacate.[4] We reject his argument.[5]

By arguing that an appellate standard of review for considering the sufficiency of the evidence should apply in this context, Green conflates two distinct inquiries. When

---

[4]    Under this appellate standard of review, courts first "winnow down the evidence presented at trial by resolving all questions of fact in favor of the jury's verdict, which results in a subset of facts that constitute the circumstances proved." *State v. Firkus*, 31 N.W.3d 468, 478 (Minn. 2026) (citations omitted) (internal quotation marks omitted). Then, courts "consider whether the reasonable inferences that can be drawn from the circumstances proved, when viewed as a whole and not as discrete, isolated facts, are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis other than guilt." *Id.* (citations omitted) (internal quotation marks omitted).

[5]    Green also argues that the district court erred by rejecting his trial testimony and Valtierra's trial testimony, which he contends constituted "direct" evidence of their lack of intent to kill, and by instead relying on "circumstantial" evidence to support its factual findings. He argues that when direct evidence contradicts circumstantial evidence, the direct evidence "must be given appropriate weight unless it is incredible as a matter of law." Green cites to *Bernhardt v. State,* 684 N.W.2d 465, 477 (Minn. 2004), for this proposition. But this case does not support his argument. In *Bernhardt*, we observed that "[c]ircumstantial evidence is entitled to the same weight as direct evidence." *Id.* at 477. Because the district court was free to conclude that Green's and Valtierra's testimony was not credible, we reject this argument.

considering the sufficiency of the evidence supporting a defendant's conviction, the appellate standard of review ensures that the State satisfied the due process requirement of proof beyond a reasonable doubt for every element of the crime of conviction. *State v. Fox*, 868 N.W.2d 206, 223 (Minn. 2015). In contrast, in the context of a petition to vacate under the Act, a district court must determine whether a petitioner convicted of felony murder has proved, by a preponderance of the evidence, that the petitioner did not have the intent to cause the death of a person. The Act, subd. 7(a). Because a petition under the Act is not equivalent to an appeal challenging the sufficiency of circumstantial evidence, the appellate standard of review does not apply in this context.

The district court properly considered whether Green proved, by a preponderance of the evidence, that he did not have the intent to kill. *See id*. Thus, the district court did not abuse its discretion.

4.

Finally, Green asserts that due to "irregularities" in the district court, we "must question whether the district court reviewed anything, or whether it simply accepted and adopted the State's request to deny without exercising independent judgment and discretion." Green points to two "irregularities." First, he notes that in the district court's initial order denying his petition, which it later vacated, the district court stated that its review of Green's preliminary application was based on facts from Green's "plea hearing." Because Green did not have a plea hearing, he contends that this mistake in the initial order indicates that "the district court was thinking of a different case when rendering rulings in Green's case." Second, Green states that the legal analysis in the

21

district court's initial order was "identical" to the legal analysis in the district court's final order issued after the evidentiary hearing. Green contends that the similarity of the two orders shows that the district court did not consider Green's evidence, amounting to an abuse of discretion.

We are not persuaded that these alleged "irregularities" show that the district court abused its discretion in considering Green's evidence and in denying Green's petition. The district court's final order correctly states that Green "was found guilty of all counts by a jury on October 15, 2004." It states that the district court reviewed Green's petition to vacate, the materials submitted with the petition, relevant records, and the submissions of the parties. And, as we concluded above, the record reasonably supports the district court's factual findings. Given these circumstances, we discern no abuse of discretion.

B.

We next turn to Green's contention that the district court abused its discretion by impermissibly relying on the jury's determinations from his 2004 trial in denying his petition to vacate. Green argues that the district court improperly rejected his attacks on A.C.'s credibility by relying on the jury verdicts and our decision on direct appeal. He contends that the district court should have independently evaluated the evidence without deferring to findings that the jury may have made in reaching its guilty verdicts. Likewise, Green argues that the district court erred when it inferred from the jury's guilty verdict for second-degree murder that the jury necessarily found that Green had the intent to kill. Green asserts that this was error because the aiding or abetting instruction the jury received did not specify whether it applied to the first-degree felony murder count alone

22

or to other counts, such as the second-degree intentional murder count. He maintains that the jury could have found him guilty of second-degree intentional murder by concluding that he only had the intent to commit an armed robbery—and not that he also had the intent to kill. We disagree with Green that the district court drew erroneous conclusions from the jury's verdicts and impermissibly relied on those conclusions instead of independently assessing the evidence before it.

Initially, we note that Green had an opportunity to present live witness testimony at an evidentiary hearing, but he elected to present the case to the district court based on exhibits, including the transcript of his own jury trial. Thus, the district court had to rely on earlier testimony to decide whether Green satisfied his burden of proving by a preponderance of the evidence that he did not intend to cause the deaths of the three victims.

Moreover, the district court order did not thoughtlessly defer to the jury's verdicts in Green's trial. It is evident from the district court's order that it independently assessed the evidence that Green presented and concluded that Green did not meet his burden of proof. The district court considered A.C.'s trial testimony that Green had a gun, Green's failure to constrain Medal-Mendoza or provide aid to the victims, Green's flight from the scene of the crime and subsequent flight to Chicago, and Green's threats to Medal-Mendoza while in custody, among other facts, in reaching its conclusion that Green failed to prove that it was more likely than not that he did not intend to kill the three victims. The jury's determinations at Green's trial were additional cumulative factors considered

by the district court. We are convinced that the district court independently evaluated the evidence to conclude that Green failed to meet his burden.

III.

Next, Green argues that the district court violated his constitutional right to testify when it observed in its order denying his petition that his trial testimony was "self-serving." Green contends that this characterization of his trial testimony implicated the constitutional principle that a defendant may not be disqualified from testifying because of bias.[6] He asserts that this was a structural constitutional error that requires automatic reversal of the district court's denial of relief under the Act. *See generally Arizona v. Fulminante*, 499 U.S. 279, 309–10 (1991).

A district court's refusal to allow a criminal defendant to take the stand and testify at trial may be constitutional error. *See State v. Rosillo*, 281 N.W.2d 877, 879 (Minn. 1979). But that is not what happened here. Green testified on his own behalf at his 2004 jury trial. As evidence in support of his petition to vacate, Green offered the transcript of his 2004 trial, which included his trial testimony.

After reviewing Green's trial testimony, which Green himself presented to the district court, the district court found it to be "self-serving." This was not a constitutional

---

[6]     Green cites to this court's opinion in *State v. Bergeron*, 452 N.W.2d 918 (Minn. 1990) to support this argument. In *Bergeron*, we held that a district court did not err in limiting the defendant's trial testimony where the defendant's denial of guilty intent was "repetitious." 452 N.W.2d at 926. We reasoned that the defendant "had a full and fair opportunity to tell his side of the story, including his lack of intent to steal." *Id.* Thus, *Bergeron* does not support Green's proposition that a district court cannot reject a defendant's version of events as being not credible or self-serving.

24

error. A district court is not required to believe a defendant's testimony. Indeed, following an evidentiary hearing, it is precisely the duty of the district court to assess a petitioner's credibility and the credibility and weight of other evidence presented to determine whether the petitioner has satisfied the petitioner's burden of proof. *See* the Act, subd. 7.

In *State v. Zielinski*, we held that a district court considering a request for relief under the Act may not make credibility determinations without first holding an evidentiary hearing. 32 N.W.3d 847, 860 (Minn. 2026). And we concluded that the district court in *Zielinski* impermissibly concluded that the petitioner's allegations were not credible without giving the petitioner an opportunity to present testimony at an evidentiary hearing. *Id.* Here, however, the district court gave Green an opportunity to present evidence—including an opportunity to testify and present other witness testimony—at the evidentiary hearing. Green chose not to testify and did not offer live witness testimony. Because Green received an evidentiary hearing and had the opportunity to present live testimony, the rule announced in *Zielinski* does not apply. And because a district court does not err by evaluating and weighing the evidence presented at an evidentiary hearing, the district court here did not err by rejecting Green's version of events as not being credible.

## IV.

Finally, Green argues that because the Act is a statute that benefits a specific class of people, and because the Legislature has made the Act retroactive, courts should apply the amelioration doctrine and the rule of lenity in interpreting the Act's requirements. He contends that, under the amelioration doctrine, courts must "liberally" interpret the Act's

25

requirements in favor of applicants. Similarly, he argues that the rule of lenity requires courts to resolve "any uncertainty about whether Green's conduct meets [the Act's] heightened intent requirement" in Green's favor. These issues present questions of law that we review de novo. *See State v. Kirby,* 899 N.W.2d 485 (Minn. 2017) (considering the application of the amelioration doctrine without deference to the district court).

Green's arguments are unavailing. The law does not support applying the amelioration doctrine or the rule of lenity in the manner Green proposes.

Courts apply the amelioration doctrine to determine when an amended statute applies to cases that are not yet final when a change in law takes effect. *Kirby*, 899 N.W.2d at 488. Under this doctrine, an amended statute applies to crimes committed before its effective date if: (1) there is no statement by the Legislature that clearly establishes the Legislature's intent to abrogate the amelioration doctrine, (2) the amendment mitigates punishment, and (3) final judgment has not been entered as of the date the amendment takes effect. *Id*. at 490. Thus, the amelioration doctrine is not a statutory interpretation rule that would require a court to construe a law's requirements in favor of one party or another. Rather, the doctrine is about which law applies—the old law or the amended one—to criminal cases that are pending when the law changes. *State v. Loveless*, 987 N.W.2d 224, 238 (Minn. 2023).

Here, the Legislature expressly made the Act retroactive by creating a process for individuals convicted before the 2023 amendment took effect to seek relief—the process that Green followed here. Because the Act expressly applies to crimes committed before the amendment's effective date, application of the amelioration doctrine is unnecessary.

Further, even if the doctrine did apply, Green would not meet its requirements because a final judgment had been entered in his case before the Act took effect.

The rule of lenity likewise does not apply to the circumstances here. The rule of lenity is a statutory construction "canon of last resort" that applies only when other canons of construction have failed to resolve an ambiguous criminal statute. *State v. Thonesavanh*, 904 N.W.2d 432, 440 (Minn. 2017). When the rule of lenity does apply, a court is required to construe the ambiguous criminal statute in favor of the defendant. *Id.*

But Green does not raise a statutory interpretation issue here. He does not contest the meaning of any of the Act's provisions, nor does he argue that the Act's language is ambiguous. Instead, Green points only to general "interpretive questions" about the Act's application. We conclude that, in reviewing the evidence presented at an evidentiary hearing under the Act, a district court is not required by these doctrines to resolve uncertainties in favor of the petitioner.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the district court.

Affirmed.